# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE HAPPY CHILD WORLD, INC. | ) | **CONSOLIDATED** |
| | ) | **C.A. No. 3402-VCS** |

## MEMORANDUM OPINION

Date Submitted: June 15, 2020
Date Decided: September 29, 2020

George H. Seitz, III, Esquire and James S. Green, Sr., Esquire of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware, Attorneys for Boraam Tanyous and Happy Child World, Inc.

Jeffrey S. Goddess, Esquire of Cooch and Taylor, P.A., Wilmington, Delaware, Attorney for Medhat Banoub and Mariam Banoub.

**SLIGHTS, Vice Chancellor**

"Perhaps the broadest and most accepted idea [in our adversarial system of justice] is that the person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims."[1]  Deeply enmeshed in the fabric of our jury trial courts, this bedrock principle of our adversarial legal system is, it seems, sometimes overlooked by parties litigating in this court of equity where matters are tried to the Bench.  This is especially so when parties come to the court charged with emotions, such as when former friends accuse each other of dishonesty leading to fractured relationships, both personal and professional.  In such instances, supplication often takes the place of proof.  The parties beseech the court to view the facts as they see them—as they lived them— whether supported by evidence or not.  But that is not how trials work.  Factual proof, not fervent pleas for justice, is what drives trial outcomes.

Yet trials, by their nature, are imperfect.  "[I]n a judicial proceeding in which there is a dispute about the facts of some earlier event, the factfinder cannot acquire unassailably accurate knowledge of what happened.  Instead, all the factfinder can

---

[1] C. Mueller & L. Kirkpatrick, *Evidence* § 3.1 (3d ed. 2003).  Stated another way, "[t]he *reus* has no duty of satisfying [t]he court; it may be doubtful, indeed extremely doubtful, whether he be not legally in the wrong and his adversary legally in the right, and yet he may gain and his adversary lose, simply because the inertia of the court has not been overcome, or, to use the more familiar figure, because the *actor* has not carried his case beyond the equilibrium of proof, or, as the case may be, of all reasonable doubt.  Whatever the standard be, it is always the *actor* and never the *reus* who has to carry his proof to the required height; for, truly speaking, it is only the *actor* that has any duty of proving at all." James B. Thayer, *The Burden of Proof*, 4 HARV. L. REV. 45, 58 (1890).

1

acquire is a belief of what probably happened."[2]  This is especially so when the factfinder must parse through testimony of witnesses attempting to recollect events that occurred more than a decade before trial, and when the parties to the litigation made no effort to document their activities or interactions in real time.   Such is the case here.

This post-trial decision resolves a decade-old dispute between former friends, Boraam Tanyous and Medhat and Mariam Banoub (together, the "Banoubs"), arising from their ultimately failed endeavor to own and operate a daycare center in New Castle County, Delaware, ironically named Happy Child World, Inc. ("HCW" or the "Company").[3]   While both parties allege they are casualties of serious breaches of fiduciary duty by the other, neither party took care to marshal evidence in support or defense of their claims, making the post-trial adjudication of this long-running dispute exceptionally difficult.   When the many evidentiary gaps were revealed during trial, the Court directed, and at times implored, the parties to fill them.[4]   Unfortunately, most of the gaps remain.  Consequently, I am left with an

---

[2] *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J. concurring).

[3] For the sake of clarity, I will occasionally refer to the parties by their given names. I intend no familiarity or disrespect.

[4] *See, e.g.*, Tr. of Post-Trial Closing Args. at 3–4 (Nov. 15, 2019) ("The lack of joinder in these papers is remarkable. . . .  It's been a frustrating exercise."); *id* at 89 (urging counsel to close evidentiary gaps, and observing: "I am loath to ask this, but there a couple of additional things that I need from counsel.  And to be clear—and I apologize for coming out and immediately lobbing criticisms, but it is frustrating, and I stand by the fact

evidentiary record that is disjointed, incomplete and wholly inadequate to enable thoughtful post-trial deliberations. But the matter is submitted for decision and the Court must render judgment.

HCW was incorporated in Delaware in 2002, with the majority-owner, Tanyous, providing the capital and the minority-owners, Medhat and Mariam Banoub, controlling the day-to-day operations of the daycare. Tanyous resided in Egypt and did not carefully oversee the Banoubs' work at HCW. This dynamic led to miscommunication, surprises, allegations of mismanagement and ultimately a disintegration of the relationship.

The Court first encountered the parties in 2007 when Tanyous filed a demand to inspect HCW's books and records under 8 *Del. C.* § 220. That dispute morphed into a dispute over who owned what equity in HCW. In 2008, the Court determined that Tanyous was the controlling shareholder of HCW, owning 55% of HCW's equity.[5] Noting its frustration with the state of the evidence, the Court observed, "the books and records of HCW are in shambles," a state of affairs that continues to frustrate the judicial resolution of the many disputes between these parties.[6]

---

[as previously expressed] that this record is unprecedented, in my experience as a trial judge, in terms of having a basis to actually render a verdict, based on gaps in evidence— but I certainly don't fault counsel.") (D.I. 417).

[5] *Tanyous v. Happy Child World, Inc.*, 2008 WL 2780357, at *7 (Del. Ch. July 17, 2008).

[6] *Id.*

After the Court declared in 2008 that Tanyous was HCW's majority owner, the Banoubs abruptly left the daycare, leaving Tanyous to assume control of HCW's operations. HCW floundered under his leadership, culminating in the State's revocation of HCW's operating license in September 2011. A year later, Tanyous executed a squeeze-out merger, cancelling the Banoubs' shares and assessing their share of the enterprise fair value at $8,457.17.

The parties then unleashed a series of claims and counterclaims in several actions before this Court, all of which were ultimately consolidated for trial. The case as currently framed presents "another progeny of one of our law's hybrid varietals: the combined appraisal and entire fairness action."[7] But this case also presents a unique twist: both owners of the corporation to be appraised have asserted claims on behalf of that corporation against the other relating to conduct that occurred before the merger. For his part, Tanyous asserts claims on behalf of HCW against the Banoubs seeking to recover damages for breach of fiduciary duties and misappropriation of corporate assets while the Banoubs operated the daycare. As a setoff to Tanyous' claims, the Banoubs counterclaim that HCW owes them back wages for work performed as the daycare's operators. They also bring their own claims on behalf of HCW against Tanyous for various breaches of fiduciary during

---

[7] *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 299 (Del. Ch. 2006).

4

the time he ran the daycare that allegedly caused the demise of the business, including misappropriation of corporate assets. Finally, in the wake of the squeeze-out merger executed by Tanyous, the Banoubs seek an appraisal of the fair value of their HCW shares under 8 *Del. C.* § 262.

One approach the Court might take to adjudicate the competing claims is to provide the plaintiff/owner bringing the claim on behalf of HCW a direct damages recovery, assuming the claim is proven, adjusted to account for that owner's *pro rata* stake in HCW. As a court of equity, this Court, I believe, would be within its authority to fashion a remedy in that manner if it did so with care.[8] At first glance, while neither party has endorsed it, one might observe a certain elegance in this approach since it would prevent wrongdoers who misappropriated corporate property from enjoying any aspect of the corporation's recovery.[9]

The other approach, and the one I follow here, is to value the competing derivative claims, incorporate those values in the appraisal of the corporation and then adjust the petitioner's appraisal recovery to account for his liability to the

---

[8] *Cf. In re El Paso Pipeline P'rs L.P. Deriv. Litig.*, 132 A.3d 67, 120–29 (Del. Ch. 2015) (providing a thorough and thoughtful explication of the law on *pro rata* direct recoveries in derivative litigation), *rev'd*, 152 A.3d 1248 (Del. 2016).

[9] *See id.* at 123 n.71 (identifying this as one of six recurring fact patterns in which "[c]ourts have been willing to award a *pro rata* recovery to shareholders") (quoting 13 Fletcher Cyclopedia of Corporations § 6028, at 325 (rev. ed. 2013)). I discuss this "wrongdoer recovery" dynamic later when performing my appraisal.

corporation. It appears, as best I can discern, that the parties endorse this approach, and it too is consistent with our law.

Unfortunately, the parties' tangled web of claims and counterclaims, fueled by rampant emotion and resting on disjointed factual and legal predicates, has resulted in a post-trial decision that is longer than it ought to be. The fault for the woefully inadequate factual record does not lie at the feet of counsel. They did their best to package what their clients gave them, which was not much. The post-trial deliberations were arduous, as reflected here, and the result, I am certain, will be unsatisfying for all involved.

My findings of fact reveal that both parties engaged in fiduciary wrongdoing, but not nearly to the extent claimed by the other. After valuing the proven claims, incorporating those values in my appraisal, and then adjusting for their liability to the Company, the end-result is that the Banoubs will receive $36,017.96 for their equity in HCW, plus appropriate pre-judgment interest.

## I. FACTUAL BACKGROUND

The Court held a three-day trial during which it received 167 exhibits, lodged depositions and live testimony.[10] I have drawn the facts from the related post-trial judgment entered in 2008, stipulations entered before trial and the evidentiary record

---

[10] Joint Trial Ex. List ("JX List") (D.I. 381).

presented during trial.[11]  The following facts were proven by a preponderance of the evidence.

## A. The Formation of HCW

In 1991, Egyptian citizen and "international businessman," Boraam Tanyous, met Medhat Banoub through mutual business acquaintances.[12]  A friendship blossomed and the two kept in touch.[13]

In 1999, Tanyous visited the newly married Medhat and his wife Mariam in the United States.[14]  Medhat revealed to Tanyous that Mariam dreamed one day of owning and operating a daycare center—a dream deferred because the newlyweds lacked the financial means to start a new business.[15]  Coincidentally, Tanyous was

---

[11] Citations will appear as follows: "PTO ¶ __" shall refer to stipulated facts in the pre-trial order; "Op. __" shall refer to the related post-trial opinion *Tanyous v. Happy Child World, Inc.*, 2008 WL 2780357 (Del. Ch. July 17, 2008); "D.I." shall refer to docket entries by docket number; "Tr. __ ([Name])" shall refer to witness testimony from the trial transcript (D.I. 389–91); "JX __" shall refer to trial exhibits using the JX-based page numbers generated for trial; "D.I. __ ([Name] Dep.) __" shall refer to witness testimony from a deposition transcript lodged with the Court for trial.

[12] Op. at *2; PTO at 3, ¶ 1. *See Greene v. Conn. Mut. Life Ins. Co.*, 1979 WL 174435, at *4 (Del. Ch. Sept. 19, 1979) (holding the court may draw factual findings from a prior opinion involving similar issues and the same parties under the doctrine of collateral estoppel). I note that even though the parties referred to the Court's prior post-trial decision extensively in their Pretrial Stipulation, I have referred to that opinion as support only for facts that are background in nature, but not for facts of consequence to the outcome here.

[13] Op. at *2; PTO at 3, ¶ 1.

[14] Op. at *2.

[15] Op. at *2; *see* Tr. 236–38 (Mariam) (recounting how the Banoubs moved to the United States in 1999 shortly after their marriage and began searching for a way to further

looking to acquire an E-2 Treaty Investor visa (the "Investor Visa") that would enable his family to move to the United States. To do so, the law required that he assume a majority ownership interest in a company chartered in the United States.[16] Hoping to seize an opportunity, Tanyous offered to provide capital for, and assume majority ownership of, a daycare center in Delaware if the Banoubs would agree to operate it.[17] Medhat demurred.[18]

Tanyous continued to press the issue. In 2001, the Banoubs agreed that the venture made sense and requested $100,000 in capital from Tanyous to acquire a daycare facility in Delaware.[19] Tanyous wired $20,000 to the Banoubs' personal bank account in the spring of 2001 and brought a check for an additional $80,000 on his next visit to Delaware in June 2001.[20] During this visit, Tanyous executed a general power of attorney authorizing Medhat to act on his behalf with respect to

---

Mariam's career in childcare); Tr. 473 (Medhat) (discussing the Banoubs' financial state in the late-1990s and early-2000s).

[16] Tr. 469 (Medhat); Op. at *2–3. The E-2 visa is authorized under the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.*

[17] PTO at 3, ¶¶ 1–4.

[18] *See id.* at 3, ¶¶ 1–2 (stating Tanyous broached the possibility of a joint business venture in the 1990s, but the suggestion did not gain traction with the Banoubs until 2001).

[19] Op. at *3; PTO at 3, ¶ 2.

[20] Op. at *2; PTO at 4, ¶ 3.

HCW in all matters, including those instances where Tanyous' signature, as majority owner, would be required to take action on behalf of the business.[21]

In 2002, Medhat purchased an operating daycare business and property in Newark, Delaware for $647,000.[22] The Banoubs secured a mortgage to finance the acquisition of the daycare with a second mortgage on their residence, while Tanyous' prior capital contributions primarily funded the down payment required for closing.[23] The newly formed Delaware corporation was named Happy Child World, Inc., and the daycare then created was to be operated under the same name.

## B. The Banoub Era

The Banoubs, who were both officers and directors of HCW, controlled HCW's day-to-day operations from September 2002 through July 18, 2008 (the "Banoub Era").[24] Mariam worked daily as the Chief Administrative Officer of the Company, and Medhat chipped in on nights and weekends to acquire supplies and perform maintenance at the facility while working a full-time job elsewhere

---

[21] Op. at *3; PTO at 4, ¶ 4.

[22] Op. at *3; PTO at 5, ¶ 8.

[23] PTO at 5, ¶ 8.

[24] *Id.* at 2, ¶ 3; *Id.* at 5–6, ¶¶ 8–9, 13; Op. at *1.

during the day.[25]  Under the Banoubs' management, HCW achieved modest growth.[26]

Issues with communication and recordkeeping surfaced early in the parties' business relationship.  In January 2003, Tanyous discovered that Medhat had unilaterally reduced Tanyous' interest in the Company from his anticipated 77.5% to 55%.[27]  Tanyous was irate, but he was ultimately persuaded to accept the change because of the significant effort expended by the Banoubs as operators of HCW.[28] He continued to bankroll HCW as a 55% owner.[29]

In July 2003, Medhat and Tanyous met with immigration attorney Emre Ozgu to assist with Tanyous' Investor Visa application.[30]  Medhat agreed to work as Tanyous' liaison during the application process.[31]  Even at that nascent stage of HCW's existence, Mr. Ozgu raised concerns about the Company's "haphazard

---

[25] Tr. 201–06 (Clark).

[26] JX 147, Ex. B; PTO at 5, ¶ 9.

[27] Op. at *4; Tr. 524–25 (Tanyous); PTO at 4, ¶ 7.

[28] Op. at *4; Tr. 524–25 (Tanyous).

[29] Op. at *4; PTO at 7, ¶ 1.

[30] Op. at *5.

[31] *Id.*; Tr. 469 (Medhat).

10

documentation" of Tanyous' investment.[32] Sure enough, Tanyous' Investor Visa application was later denied for precisely that reason.[33]

Trust between the parties was eroded further when, in December 2005, Tanyous saw that HCW's 2004 tax return disclosed that the Banoubs' ownership interest in HCW was 80% while his was 20%.[34] Tanyous took the extraordinary step of flying from Kuwait to Delaware in order to confront Medhat about this latest unauthorized attempt to dilute Tanyous' majority ownership stake in HCW.[35] This time Medhat relented, agreeing to amend the tax returns to reflect the previously agreed 55-45% split.[36] At that point, Tanyous curtailed Medhat's authority conferred by the 2001 power of attorney, thereby limiting Medhat's ability to act on behalf of the business.[37]

Trouble finally overwhelmed the business relationship when, in 2006, the Banoubs formed Happy Kids Academy, Inc. ("HKA"), another Delaware corporation through which the Banoubs acquired a competing daycare facility in

---

[32] Op. at *5.

[33] *Id.*

[34] *Id.*; Tr. 338–39, 475–77 (Medhat); Tr. 556–57 (Tanyous).

[35] Op. at *5; Tr. 338–39, 475–77 (Medhat).

[36] Op. at *5; Tr. 338–39, 475–77 (Medhat).

[37] JX 32; Tr. 556–58 (Tanyous).

11

Newark, Delaware.[38]   Tanyous raised concerns that the Banoubs were neglecting HCW to prop up HKA.[39]   In 2007, Tanyous demanded, through Delaware counsel, to inspect HCW's books and records pursuant to 8 *Del. C.* § 220 ("Section 220").[40] The Banoubs refused the demand on the basis that Tanyous' contributions to HCW were loans, not capital contributions for equity, and, therefore, Tanyous did not possess stockholder inspection rights under Section 220.[41]   The dispute culminated in a post-trial Opinion from this Court in July 2008 finding that Tanyous was the controlling shareholder of HCW with a 55% equity stake.[42]

In response to the Court's opinion, the Banoubs promptly ceased their work at HCW and turned their full efforts to running HKA.[43]   This left Tanyous to take over the day-to-day operations of HCW as both controlling shareholder and daycare manager.[44]

---

[38] Op. at *6; Tr. 284–85, 303 (Mariam); Tr. 411 (Medhat).

[39] Op. at *6; PTO at 8, ¶¶ 4–5.

[40] Op. at *6; PTO at 6, ¶ 13.

[41] Op. at *6; PTO at 6, ¶ 13.

[42] Op. at *2–7; PTO at 6, ¶ 13.

[43] Tr. 463 (Medhat).

[44] Tr. 525–26 (Tanyous).

## C. The Tanyous Era

The Tanyous Era began at the close of the July 2008 litigation, when Tanyous replaced the Banoubs as operator of HCW.[45] Tanyous' stewardship was turbulent from the start, beginning with his allegation that the Banoubs had stolen HCW records. According to Tanyous, on July 18, 2008, the day after the Section 220 litigation concluded, the Banoubs removed all HCW attendance and State program records from before 2006, a desktop computer containing operating records, and other records used in HCW's day-to-day operations[46] The Banoubs denied the allegations and maintained they left all files that were needed to run the business at the daycare.[47]

Stolen or not, the HCW records in dispute are not in the trial record. In an attempt to fill this void, Tanyous engaged a forensic accountant, David Ford, CPA, to attempt to reconstruct the missing records in a costly effort that, according to Tanyous, was ultimately unsuccessful.[48]

Because he was fully engaged in business dealings abroad, Tanyous left the day-to-day operations of HCW to his wife, Gaklin Guirguis, and his associate, Nabil

---

[45] D.I. 385 (Tanyous Dep.) 6–7; Tr. 531–33 (Tanyous).

[46] Tr. 533–38 (Tanyous).

[47] Tr. 445–49, 498–502 (Medhat); Tr. 286–69 (Mariam).

[48] PTO at 13–14, ¶¶ 1–3.

13

Girgis.[49]  Under their supervision, HCW's performance suffered.  Receipts fell by $108,119 in 2009, from $462,035 to $353,916, and fell another $51,543 in 2010, from $353,916 to $302,373.[50]  In addition to declining financial performance, HCW struggled to meet regulatory standards.  The daycare was cited by the State Office of Child Care Licensing (the "OCCL") for numerous instances of non-compliance with State daycare standards in late 2008 and April 2009.[51]  OCCL placed the daycare on a two-year "Warning of Probation" in May 2009.[52]  In September 2010, HCW's continued noncompliance caused the OCCL to escalate the daycare's probationary status closer to license revocation.[53]

Girgis resigned in April 2011 amidst mounting conflict with the OCCL.[54] He was replaced by Tanyous' son-in-law, David Mikhaiel,[55] who worked with Program Director, Deborah Hofmann, and Mrs. Guirguis to bring HCW up to code.[56]

---

[49] D.I. 383 (Girgis Dep.) 6–13.

[50] JX 147, Ex. B.

[51] JX 127.

[52] *Id.*

[53] Surprisingly, notwithstanding the parties' inability to produce records throughout this and previous litigation, HCW does not appear to have been cited by the OCCL for its insufficient record keeping.  *See* JX 70, 74–76, 79, 86, 102–04, 107–11.

[54] JX 94.

[55] Tr. 566 (Tanyous).

[56] JX 93.

Despite these efforts, new management could not right the listing ship. By mid-August 2011, the OCCL observed "the facility [appears to be] spiraling out of control."[57] Two days later, HCW closed its doors.[58] Consequently, the OCCL suspended HCW's license and then revoked it on September 27, 2011.[59]

When HCW closed its doors, parents were told to direct all questions to Little Scholars—a separate daycare facility acquired by Tanyous in 2007, also located in Newark, Delaware.[60] While Tanyous and his wife owned Little Scholars,[61] Girgis ran its day-to-day operations.[62] Given that Girgis, at various times, had been in charge of both HCW and Little Scholars, there was significant overlap between the management of the two daycares.[63] But, unlike HCW, Little Scholars was successful and remains in operation today.[64]

---

[57] JX 111.

[58] JX 113.

[59] PTO at 16, ¶ 6.

[60] JX 52, 55, 100, 113; Tr. 528 (Tanyous).

[61] JX 48–49, 52, 55, 100; Tr. 530 (Tanyous).

[62] PTO at 16–17, ¶¶ 7–9.

[63] D.I. 383 (Girgis Dep.) 6–13, 59–63, 78, 115–24.

[64] PTO at 16–17, ¶¶ 7–9.

## D. The Merger

On August 6, 2012 (the "Merger Date"), Tanyous acted as the majority stockholder of HCW, without a meeting and by written consent under Section 228 of the Delaware General Corporation Law, to adopt resolutions approving the merger of HCW into Happy Child World Acquisition Corp. ("HCWA") (the "Merger").[65] As a result of the Merger, HCW shares previously held by the Banoubs were cancelled and converted into the right to receive cash.[66] The fair value of the Banoubs' equity ownership in HCW was set at $8,457.17 by a valuation expert retained by Tanyous.[67] The Banoubs elected to pass on the merger consideration and to exercise their right to appraisal.

## E. Procedural History

The Court (through my predecessor) is familiar with these parties from prior litigation that relates directly to the claims addressed here.[68] As noted, in his first Verified Complaint filed on May 2, 2007, Tanyous sought an order compelling HCW to allow him to inspect HCW's books and records under Section 220.[69] HCW

---

[65] *Id.* at 6, ¶ 1.

[66] *Id.* at 6, ¶ 3.

[67] JX 147, 149.

[68] *See Tanyous*, 2008 WL 2780357.

[69] *Id.*

filed its Answer on June 6, 2007, refusing to comply with Tanyous' books and records demand on the ground that Tanyous was not a stockholder of HCW.[70] This prompted a contest over HCW ownership, with Tanyous' standing to assert rights under Section 220 as the ultimate question to be decided.[71] That case was tried from October 23–24, 2007. In its post-trial decision, the Court concluded that Tanyous was, in fact, the owner of 55% of HCW's equity and entitled to inspect its books and records.[72]

On December 11, 2007, Tanyous filed his original Complaint in this action, which he Amended on February 13, 2008.[73] The Amended Complaint comprises six counts. Count I asserts a claim for appointment of a Custodian pursuant to 8 *Del. C.* § 226; Count II asserts a claim for declaratory judgment that Tanyous owns a 55% interest in HCW; Count III asserts a claim for breach of fiduciary duties against the Banoubs; Count IV asserts a claim for conversion of HCW assets by the Banoubs; Count V asserts a claim for an accounting; and Count VI asserts a claim for breach of contract and fraud against the Banoubs.[74]

---

[70] *Id.*

[71] *Id.*

[72] *Id.* at *6–7.

[73] Compl. (D.I. 1); Am. Compl. (D.I. 7).

[74] Am. Compl. ¶¶ 64–94.

Count II was decided in the books and records litigation.[75] Tanyous' application for appointment of a Custodian was denied on May 22, 2008.[76] Thereafter, Tanyous filed his Second Amended Verified Complaint (his now operative Complaint) on November 24, 2008, in which he reasserted the initial Complaint's Counts III–VI as Counts I–IV, respectively.[77]

Complicating matters for the next decade of litigation, the Banoubs' counsel withdrew (for good reason), leaving the Banoubs without counsel to defend complex claims and then to initiate and pursue their own complex claims.[78] Proceeding *pro se*, the Banoubs denied Tanyous' allegations,[79] brought counterclaims,[80] and then initiated or defended years' worth of often-misguided motion practice.[81]

---

[75] *See Tanyous*, 2008 WL 2780357, at *6.

[76] *Tanyous v. Banoub*, 3402-VCN, at 4 (Del. Ch. May 22, 2008) (denying Tanyous' motion for appointment of custodian) (D.I. 18).

[77] 2d Am. Compl. ¶¶ 71–90 (D.I. 37).

[78] Mot. to Withdraw Appearance (D.I. 28); *Tanyous v. Banoub*, 3402-VCN (Del. Ch. Dec. 5, 2008) (ORDER) (granting motion to withdraw as Banoubs' counsel) (D.I. 44).

[79] Defs.' Answer to 2d Am. Compl. (D.I. 48).

[80] *Tanyous v. Banoub*, 3402-VCN, at 3 (Del. Ch. Apr. 26, 2012) (granting the Banoubs leave to assert counterclaims) (D.I. 168).

[81] *See generally* D.I. 49–147.

The Banoubs' counterclaims, as currently pled, comprise five counts.[82] Count I asserts a claim for breach of contract against HCW, as a setoff to Tanyous' accounting demand and derivative claims; Count II asserts a claim for breach of fiduciary duty against Tanyous; Count III asserts a claim of waste against Tanyous; Count IV asserts a claim for misappropriation of corporate funds against Tanyous; and Count V asserts a claim for gross mismanagement, again against Tanyous.[83] The Banoubs' filed a separate action seeking appraisal under Section 262 of the DGCL following Tanyous' execution of the squeeze-out Merger on December 3, 2012.[84] The Court consolidated the appraisal action with the plenary fiduciary duty actions in December 2017.[85]

Once again, years of motion practice (mainly discovery) ensued.[86] As among the countless motions brought by the parties, one is relevant here. On April 4, 2018,

---

[82] Defs.' Am. Countercl. (D.I. 157).

[83] *Id.*

[84] D.I. 1 (C.A. No. 8076-VCS).

[85] *In re Happy Child World, Inc.*, 3402-VCS, at 2 (ORDER) (Del. Ch. Dec. 29, 2017) (granting motion to consolidate) (D.I. 289).

[86] *See generally* D.I. 152–266; Letter from Court to Parties (Jan. 29, 2018) (concerning discovery issues) (D.I. 300); Letter from Court to Parties (Feb. 21, 2018) (regarding additional document requests) (D.I. 305); Letter from Court to Parties (Mar. 27, 2018) (regarding document requests) (D.I. 316).

the Banoubs filed a Motion for Discovery Abuse and Spoliation, which, given its fact-intensive premise, was deferred to trial and is addressed below.[87]

When it became clear the matter was proceeding to trial, the Banoubs finally heeded the Court's many admonitions and retained counsel in June 2018, ending their ten years of self-representation.[88] That important development restored order to the litigation and allowed the case to be readied for trial.

Trial convened from February 12 to February 14, 2019. After post-trial briefing and oral arguments were completed, I requested several supplemental submissions in an effort to focus the issues for decision, and ultimately deemed the matter submitted on June 15, 2020.

In post-trial briefing, Tanyous did not brief his claims for breach of contract and fraud. Similarly, the Banoubs did not brief their claim for waste. And "Delaware law does not recognize an independent cause of action . . . for reckless and gross mismanagement. Such claims are treated as claims for breach of fiduciary

---

[87] Banoubs' Mot. for Disc. Abuse and Spoliation, Apr. 4, 2018 (D.I. 321).

[88] Entry of Appearance by Jeffery S. Goddess, Esquire, on behalf of the Banoubs, June 8, 2018 (D.I. 358).

duty."[89]  Accordingly, I deem all of those claims either waived or not supported as a matter of law.[90]

Thus, what remains for decision are Tanyous' claims against the Banoubs for breach of fiduciary duties (Count I) and conversion (Count II), and the Banoubs' counterclaims against HCW for spoliation, breach of contract (Count I), breach of fiduciary duty (Count II), misappropriation (Count IV), and the appraisal action.

## II. ANALYSIS

The claims submitted for decision correspond to each of the timeframes delineated above.  The Banoub Era gave rise to Tanyous' claims (on behalf of HCW) against the Banoubs, as well as the Banoubs' direct claims against HCW for unfulfilled obligations, which they present as "offsets" to any damages awarded to HCW.  The Tanyous Era gave rise to the Banoubs' derivative claims against Tanyous for breach of fiduciary duties.  Finally, the Merger gave rise to the Banoubs' appraisal action.

I begin by addressing the Banoubs' threshold claim that HCW (through Tanyous) should be found liable for spoliation of evidence.  I address this claim first because, if proven, evidence secretion or destruction might justify negative

---

[89] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 114 n.6 (Del. Ch. 2009).

[90] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

inferences that would color the lens through which all of the other claims are viewed. As explained below, the Banoubs have failed to demonstrate intentional or reckless destruction of evidence, so their spoliation claim fails.

I next address Tanyous' derivative claims for breach of fiduciary duties and misappropriation of corporate assets, as well as the Banoubs' "setoff" counterclaims against HCW for outstanding loans and wages. After rejecting the factual premise of most of the claims, I value Tanyous' derivative claims at $62,199.11. I reject the Banoubs' offset counterclaims.

I then take up the value of the Banoubs' derivative claims against Tanyous for breach of fiduciary. I value those claims at $20,099.19.

Next, I address the Banoubs' claim that the process leading to the squeeze-out Merger was unfair. I reject that claim as to process, but do find that the price at which the Merger was executed was unfair.

Finally, I address the Banoubs' appraisal action, encompassing the value of the derivative claims both parties have asserted against the other. While it might be possible to adjudicate the parties' competing derivative claims post-merger outside of the appraisal process, and to fashion a remedy for proven claims as a matter of equity, I have elected instead to value the derivative claims, all of which were possessed by HCW at the time of the Merger, and then incorporate those values into my final fair value appraisal. I take this approach for two reasons. First, as discussed

below, it is the approach the parties have endorsed, although not as clearly as they might have.[91]  Second, I am satisfied this approach is consistent with our law.[92]

After carefully considering "all relevant factors,"[93] I have appraised the fair value of HCW as of the Merger at $218,260.15, and assess the Banoubs' share of that value, after adjusting for liabilities, at $36,017.96 (or $800.40 per share).

## A. HCW (Through Tanyous) Did Not Commit Spoliation

Before finding spoliation, "a trial court must first determine that a party acted willfully or recklessly in failing to preserve evidence."[94]  And, before imposing an adverse inference sanction following a finding of spoliation, the court must be satisfied that the aggrieved party has demonstrated "a reasonable possibility, based

---

[91] *See* PTO at 2 (referring to letter from Tanyous' counsel conceding that derivative claims should be valued in the appraisal action and citing for that proposition, *Kohls v. Duthie*, 765 A.2d 1274, 1289 n.33 (Del. Ch. 2000)); Banoubs' Post-Trial Opening Br. at 2 (acknowledging that derivative claims should be valued in the appraisal) (D.I. 399). *See also Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142 (Del. 1989) (observing that it was appropriate for the trial court to value derivative claims in a statutory appraisal because, in addition to comporting with Delaware law, the parties "consented" to "accord recognition to derivative-like claims for future valuation purposes").

[92] *See Nagy v. Bistricer*, 770 A.2d 43, 55–56 (Del. Ch. 2000) (holding the court should value breach of fiduciary claims in an appraisal proceeding as "those claims are assets of the corporation being valued"); *Porter v. Tex. Commerce Bancshares, Inc.*, 1989 WL 120358, at *5 (Del. Ch. Oct. 12, 1989) (Allen, C.) ("If the company has substantial and valuable derivative claims, they, like any asset of the company, may be valued in an appraisal.").

[93] 8 *Del. C.* § 262(h).

[94] *Sears, Roebuck and Co. v. Midcap*, 893 A.2d 542, 548 (Del. 2006).

23

on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause."[95]

The Banoubs proffer four bases upon which the Court could justify a finding of spoliation. First, they assert Tanyous did not respond to the Banoubs' discovery requests until 2015, years after they were propounded. Second, former HCW employee Girgis admitted to shredding paid invoices while litigation was ongoing.[96] Third, Tanyous purported to lose "a box containing HCW operating records" after a burglary of his home in December 2010.[97] Fourth, Tanyous' wife, Guirguis, failed to appear at trial even though the Banoubs moved to compel her attendance after she returned to her home in Kuwait.[98]

After carefully reviewing the record, I am satisfied the Banoubs have not carried their burden to prove intentional or reckless destruction of favorable evidence. *First*, counsel's unresponsiveness does not fit under the rubric of spoliation, as there is no alleged destruction of evidence. Discovery in this case was an exercise in boundless frustration (and delay) for all concerned. That some

---

[95] *In re DaimlerChrysler AG*, 2003 WL 22951696, at *2 (D. Del. Nov. 25, 2003) (internal quotations omitted).

[96] D.I. 383 (Girgis Dep.) 17, 21.

[97] JX 156.

[98] D.I. 54; Tr. 583–84 (Tanyous).

24

discovery responses were delayed was par for the course (on both sides) in this litigation.  *Second*, while Girgis admitted to shredding HCW's paid invoices after his employment there concluded,[99] a substantial amount of HCW's payroll and operating records were ultimately made available to the Banoubs through other sources.[100]  And there is no indication that what little is missing would have been favorable to the Banoubs.[101]  *Third*, there is no persuasive evidence that materials lost in the burglary of Tanyous' home were intentionally secreted or destroyed.  The testimony regarding the burglary was credible.[102]  *Finally*, Guirguis' failure to appear at trial is due in large part to the Banoubs' own lack of diligence: they did not seek to take her deposition and only requested her attendance on the last day of the discovery period.  Moreover, the Banoubs' argument that her testimony is suddenly crucial to their case is particularly hard to believe when, in their post-trial brief, they characterize Guirguis' role at HCW as so negligible as to disable her from

---

[99] D.I. 383 (Girgis Dep.) 17, 22.

[100] JX 61–62.

[101] I note that both parties accuse the other of either stealing, secreting or losing documents. There has been little precision attending these allegations, leaving the Court to guess what other records might exist and how they might help or hurt either party's cause.  Suffice it to say, neither the Banoubs nor Tanyous were good record keepers.  That is all that can be drawn from the cross-accusations and the evidentiary record submitted at trial.

[102] Tr. 580–82 (Tanyous).

drawing any salary from the Company.[103]   The spoliation claim fails for want of proof.

## B. Tanyous' Derivative Claims and the Banoubs' Setoff Counterclaims

Tanyous seeks entry of a judgment against the Banoubs for breach of their fiduciary duty of loyalty as officers by engaging in self-dealing, as well as misappropriating corporate funds.  He offers several categories of alleged damages totaling $857,628.  To reach this number, Tanyous relies principally upon an expert forensic analysis of corporate records he commissioned at the close of the Banoub Era.[104]  This report (the "Damages Report") was based not on the Company's books and records—which Tanyous alleges were taken by the Banoubs when they left HCW—but rather on a compilation of records produced by third-parties (mainly banks).[105]

I begin by laying out the legal standards by which Tanyous' derivative claims must be evaluated.  The standards are particularly important here, where so little evidence has been produced by either party to support or rebut any claim.  Next,

---

[103] Banoubs' Post-Trial Opening Br. at 42.

[104] JX 82.  I note that Tanyous originally included an additional claim for damages based on a stolen corporate opportunity when the Banoubs founded Happy Kids Academy.  That claim was abandoned in the Tanyous Post-Trial Answering Brief.  *See* Tanyous' Post-Trial Answering Br. at 39 ("HCW is not pressing any corporate opportunity claim.") (D.I. 402).

[105] JX 82 at 4.

I evaluate Tanyous' claims on their merits. I organize the claims into four categories: compensation-related claims, expense-related claims, revenue-related claims and Tanyous' catch-all "suggestions of additional damages." I then address Tanyous' claim seeking reimbursement from the Banoubs for the cost of recreating HCW's records. Finally, I address the Banoubs' "setoff" counterclaims.

### 1. The Legal Standards

Tanyous' derivative claims implicate the fiduciary duty of loyalty, as well as conversion, for which the generally applicable standards are well settled.[106] "The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes."[107] "Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision."[108] "If corporate fiduciaries stand on both sides of a challenged transaction, an instance where the directors' loyalty has

---

[106] While Tanyous stated in the parties' Joint Pretrial Stipulation that he would present a claim of corporate waste as a separate cause of action, his Post-Trial Briefs did not address this claim and so it is deemed withdrawn.

[107] *Steiner v. Meyerson*, 1995 WL 441999, at \*2 (Del. Ch. July 19, 1995) (Allen, C.).

[108] *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at \*21 (Del. Ch. June 6, 1996) (Allen, C.).

been called into question, the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction."[109]

A party bringing a claim for fiduciary breach generally "ha[s] the burden of proving each element, including damages, of each of [his] causes of action . . . by a preponderance of the evidence."[110] "[P]roof by a preponderance of the evidence means that something is more likely than not."[111] "By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, the Plaintiff[] lose[s]."[112] In the context of Tanyous' breach of fiduciary duty claims, his burden is to prove a basis to implicate self-dealing. If he carries that burden, then the burden shifts to the fiduciaries (the Banoubs) to demonstrate that the dealings were entirely fair.[113]

---

[109] *Oliver v. Boston Univ.*, 2006 WL 1064169, at \*18 (Del. Ch. Apr. 14, 2006).

[110] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at \*8 (Del. Ch. Oct. 30, 2015).

[111] *Narayanan v. Sutherland Glob. Hldgs. Inc.*, 2016 WL 3682617, at \*8 (Del. Ch. July 5, 2016) (citing *Aigilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at \*14 (Del. Ch. Feb. 18, 2010)).

[112] *Revolution Retail*, 2015 WL 6611601, at \*9 (quoting *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at \*12 (Del. Ch. Oct. 14, 2015)).

[113] *See Avande, Inc. v. Evans*, 2019 WL 3800168, at \*12 (Del. Ch. Aug. 13, 2019) (determining a party asserting a claim for an accounting of the disposition of assets must first make "a *prima facie* showing based on *substantial* evidence that the expenditures in question are self-interested transactions.") (emphasis in original); *Technicorp Int'l II, Inc. v. Johnston*, 1997 WL 538671, at \*15–16 (Del. Ch. Aug. 25, 1997) (holding that plaintiff must make an initial showing of fiduciary self-dealing before the court will shift the burden

28

If Tanyous fails to meet his *prima facie* burden, then the Court cannot and will not shift the burden of proof to the Banoubs as fiduciaries to defend the entire fairness of their conduct.[114] Instead, the Court must review their decisions and conduct under the deferential business judgment rule, which "is a presumption that in making a business decision the [fiduciary] acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[115]

"Entire fairness has two components: fair dealing and fair price. 'Fair dealing' focuses on the actual conduct of corporate fiduciaries in effecting a transaction, such

---

to the fiduciary "of proving the fairness of the transaction"); *CanCan Dev., LLC v. Manno*, 2015 WL 3400789, at *19 (Del. Ch. May 27, 2015) (allocating to the defendant fiduciary the "burden of accounting for compensation and expenses" only after plaintiff demonstrated that the transactions were self-interested); *Zutrau v. Jansing*, 2014 WL 3772859, at *27–28 (Del. Ch. July 31, 2014) (refusing post-trial to shift the burden to fiduciary defendants under *Technicorp* after the plaintiff failed to make "a *prima facie* showing that any of the remaining Amex charges were incurred improperly . . . [with] substantial evidence"); *Sutherland v. Sutherland*, 2010 WL 1838968, at *16 (Del. Ch. May 3, 2010) (granting summary judgment for defendants after plaintiffs failed to make the *prima facie* showing of "unaccounted-for dispositions" of corporate assets as required by *Technicorp*); *Carlson v. Hallinan*, 925 A.2d 506, 537 (Del. Ch. 2006) (holding post-trial that an accounting would be necessary after "Plaintiffs' showing of definite instances where [fiduciary] Defendants did not properly allocate expenses").

[114] *Avande*, 2019 WL 3800168, at *12.

[115] *Aronson v. Lewis*, 463 A.2d 805, 811 (Del. 1984).

as its initiation, structure, and negotiation. 'Fair price' includes all relevant factors relating to the economic and financial considerations of the proposed transaction."[116]

As for conversion, that claim rests on "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it."[117] In order to state a claim for conversion, "the plaintiff must generally allege that the defendant violated an independent legal duty."[118]

### 2. The Compensation-Related Claims

Tanyous challenges the Banoubs' right to draw any salary from HCW without his approval as an independent director and majority shareholder. He also claims that, even if authorized, the Banoubs' salary was excessive. Finally, Tanyous alleges the Banoubs improperly diverted HCW funds from their salary into an unauthorized retirement account.

---

[116] *Carlson*, 925 A.2d at 531 (internal quotations omitted). Fair price is commonly characterized as the most important consideration in determining the fairness of the transaction. *See, e.g.*, *Del. Open MRI*, 898 A.2d at 311 ("[T]he overriding consideration [in an entire fairness review of a transaction] is whether the substantive terms of the transaction were fair.").

[117] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)).

[118] *Id.*

### a. Excess Salary

According to Tanyous, based on the Damages Report, the Banoubs received $256,975 in excessive salary payments.[119]  The Banoubs do not dispute the Damages Report's calculation of the amounts they drew from HCW as compensation while they served as corporate officers.  They argue, instead, that their compensation was entirely justified and not excessive.[120]

To shift to an officer the burden to prove that his compensation was entirely fair, a plaintiff must first show that the board or the relevant committee lacked independence or good faith in making or approving the compensation award.[121]  "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[122]  "Self-interested compensation decisions made without independent protections are subject to the same entire fairness review as any other interested transaction."[123]

---

[119] JX 82 at 25–29; PTO at 12, ¶ 13(l).

[120] Banoubs' Post-Trial Opening Br. at 21–25.

[121] *Nelson v. Emerson*, 2008 WL 1961150, at *9 (Del. Ch. May 6, 2008); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del. Ch. 1996).

[122] *Aronson*, 473 A.2d at 816.

[123] *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 745 (Del. Ch. 2007); *see also Carlson*, 925 A.2d at 529 (holding that executive defendants were on both sides of a decision to cause their company to pay them executive compensation and thus bore the burden of establishing their compensation was entirely fair).

Not surprisingly, there was no formal process that led to setting compensation for the Banoubs, at either the HCW board level or otherwise. Indeed, the Banoubs admit they set their own salary without any process at all, placing the burden on them to prove that their compensation was entirely fair.[124]

No process, in this context, is an unfair process. Medhat admitted at trial the Banoubs did not consult Tanyous when deciding whether or how much to pay themselves.[125] While Medhat asserted that Tanyous generally knew what the Banoubs were paying themselves because that information was buried in the documentation submitted to obtain his Investor Visa,[126] that evidence is not in the record, and that visa was ultimately denied due to poor documentation.[127] The fact that HCW is a small company does not excuse the Banoubs "complete and total failure to adopt *any* meaningful procedure for ensuring" that compensation decisions were reasonable to the corporation.[128]

---

[124] Tr. 469 (Medhat).

[125] Tr. 468–70 (Medhat). Medhat still maintains that he had no duty to consult with Tanyous because Tanyous was merely a lender, not an owner. *Id.*

[126] Tr. 469 (Medhat).

[127] Op. at *4.

[128] *Zutrau*, 2014 WL 3772859, at *23 (emphasis in original).

As for fair price, the Damages Report reveals the Banoubs took "Officers' Salaries" of $360,855 over six years, for an average salary of $60,142.50 per year between the two.[129]   They also drew $42,889 over six years in "Other Salary Payments," averaging $7,148 per year.[130]  As factfinder, I do not view this average salary as excessive on its face.  Mariam worked at HCW full-time from its inception, serving as "Chief Administrator" of the center, which State regulations define as "the person designated by the governing body of a Center to assume direct responsibility for and continuous supervision of the day-to-day operation of the Center."[131]  While Tanyous presented testimony from employee Deborah Hoffman that the Banoubs were rarely present, this was contradicted by more credible testimony from co-worker Deborah Clark that Mariam worked long hours.[132] Mariam also shepherded HCW's enrollment in important State programs, such as the Purchase of Care ("POC") program, which expanded HCW's client-base by qualifying the daycare to receive supplemental tuition payments from the State for lower income families.[133]   For his part, Medhat testified that he worked at the

---

[129] JX 82, Ex. N.

[130] *Id.*

[131] JX 70.

[132] Tr. 201–06 (Clark).

[133] Tr. 263–64 (Mariam).

daycare on weekends and evenings when he was not working his full-time job,[134] and he only began drawing salary in 2006 for less than $8,846.[135]

On the other hand, while the Banoubs presented credible testimony that they worked hard as operators, they did not provide evidence of what their work was worth (through comparables or otherwise). And, notwithstanding their hard work, the Banoubs' salary increased even as they started a separate daycare business and even as HCW's performance suffered.[136] In 2006, Medhat drew salary of $8,846, while Mariam's pay continued to increase from $52,003 in 2004 to $60,660 in 2005.[137] That same year, the Banoubs started their own daycare, HKA, presumably leaving them less time to attend to HCW.[138] Even still, their collective wages skyrocketed 39% from $69,506 in 2006 to $96,731 in 2007.[139] And yet, HCW's net

---

[134] Tr. 331 (Medhat).

[135] JX 82, Ex. N.

[136] In evaluating the entire fairness of a salary, courts may look to evidence that the compensation was appropriate in light of the company's economic and financial circumstances. *Cf. Carlson*, 925 A.2d at 536 (holding defendants failed to show the fairness of their compensation where no credible "attempt to quantify the value of those goods and services or to show the relation between them and the [compensation]" was made).

[137] JX 82, Ex. N.

[138] Tr. 284–85, 303 (Mariam); Tr. 411 (Medhat).

[139] JX 82, Ex. N.

income fell from the previous year's $4,841 to -$74,808.[140]  Of course, Tanyous directed his books and records request to HCW that same year, catalyzing the dispute between the two parties.[141]  In 2008, the Banoubs' salaries collectively were on track to reach a near-six digit number prior to this Court's decision resolving the ownership dispute in July of that year, which, as noted, prompted the Banoubs' abrupt departure from the daycare.[142]

There is only one year of compensation on record that might have been approved/ratified by the majority owner (Tanyous).[143]  In December 2005, Tanyous signed a revised 2004 income tax return.  That tax return showed clearly on its first page: "Compensation of officers . . . $52,308."[144]  A majority owner's signature on a tax return typically would not suffice to ratify unilateral self-interested

---

[140] JX 147, Ex. B.

[141] *See* Op. at *2–7 (holding Tanyous was not a lender to, but rather a majority owner of, HCW); *see also* PTO at 6, ¶ 13 (summarizing the prior litigation between the parties).

[142] JX 82, Ex. N.

[143] I note here that the gravamen of Tanyous' compensation-related claims is that the Banoubs failed to obtain his approval as majority owner to pay themselves *any* compensation.  To the extent the Banoubs present evidence that Tanyous did, in fact, approve their compensation in any particular year, that would go a long way toward undermining at least a significant factual predicate of the compensation-related claims.

[144] JX 32.

compensation decisions by corporate officers.[145] In this case, however, where the majority owner alleges a loyalty breach based on the officers' failure to advise him that they were drawing any salary, the highly scrutinized 2004 tax return puts the lie to that claim. This was the same tax return that listed the inaccurate equity split that caused Tanyous to travel from Kuwait to Delaware to confront the Banoubs.[146] That confrontation led Tanyous to limit Medhat's power of attorney.[147] Even still, Tanyous—an independent director and majority shareholder accompanied by an English translator—signed off on that document after an evidently meaningful review of its contents, which included clear disclosure of the fact and amount of the Banoubs' annual compensation.[148]

After carefully reviewing the evidence, I conclude the Banoubs failed to meet their burden to prove, with competent evidence, that their salary was entirely fair in any year except 2004. This leaves for decision the question of remedy for the breach.

---

[145] *See CanCan Dev.*, 2015 WL 3400789, at \*16 (refusing to protect defendant with the business judgment rule for compensation decisions where an arguably dependent business partner approved larger checks that encompassed salary increases).

[146] Op. at \*5; Tr. 556–58 (Tanyous).

[147] Tr. 556–58 (Tanyous).

[148] I note here that I give no weight to Tanyous' self-serving testimony at trial that he expressly forbade the Banoubs from drawing salary from HCW. *See* Tr. 525 (Tanyous) ("Q. Did you authorize Mr. and Mrs. Banoub to take a salary from Happy Child World? A. No."). That testimony makes no sense given all parties' understanding that the Banoubs would be on point for all aspects of the daycare's operations.

"When a transaction does not meet the entire fairness standard, the Court of Chancery may fashion any form of equitable and monetary relief as may be appropriate."[149]

Starting with the Banoubs' ratified 2004 salary, I apply the Damages Report's 3.0% inflation rate to estimate their entirely fair salary both on a backward- and forward-looking basis. For the year 2008, I calculate the Banoubs' salary *pro rata* for the seven and one-half months they worked at HCW, until they left on July 18, 2008. The results are as follows:

**The Banoubs' Wages**

| | |
|---|---|
| 2002 | $49,216.60 |
| 2003 | $50,738.76 |
| 2004 | $52,308.00 |
| 2005 | $53,877.24 |
| 2006 | $55,493.56 |
| 2007 | $57,158.36 |
| 2008 | $35,723.98 |
| **Total** | $354,516.50 |

Based on this calculation, I find that the Banoubs were entitled to draw compensation from HCW in the amount of $354,516.50. As noted, they actually drew salary of $403,744.

---

[149] *Julian v. E. States Constr. Serv., Inc.*, 2008 WL 2673300, at *19 (Del. Ch. July 8, 2008). *See also Technicorp,* 1997 WL 538671, at *15 (providing a remedy after determining a fiduciary had improperly set his own salary that accounted for the value of the service the fiduciary did provide to the corporation).

### b. Retirement Funding

Tanyous next claims the Banoubs' retirement funding in the amount of $33,597 amounts to improper self-dealing.[150] The Banoubs admit they unilaterally determined to apply these funds for retirement savings, but argue the funds were diverted from their salary and thus were not paid by HCW directly.[151]

An employee's decision to divert money from his salary into a retirement savings account has no adverse effect on the employer. If the employee causes the company to match the employee's contribution, however, that, obviously, does affect the employer. And if that employee is a fiduciary, that self-interested decision will be reviewed for entire fairness.

Here, there is no evidence that HCW made any significant matching contribution to the Banoubs' retirement savings.[152] While the Damages Report calculated the Banoubs' salary, the report provides no indication that the Banoubs caused HCW to match their contributions to their retirement account.[153] The only evidence of company matching in the record reveals that employee salaries were

---

[150] JX 82 at 10–11; PTO at 13, ¶ 13(m).

[151] Banoubs' Post-Trial Opening Br. at 7–8 (citing JX 28, 78).

[152] Tr. 131–32 (Ford).

[153] *See* JX 82 at 11 ("The review of the available Form W-2's for Mrs. Banoub did reflect that the retirement payments were withheld from her payroll and remitted to the SEP.").

matched at $3.85 per biweekly pay, or just $100 per year, and that four other employees benefitted from this program.[154] Even assuming the burden shifts to the Banoubs to justify this limited company matching, the cost to the Company is *de minimis* and reasonable on its face.

Because the Banoubs' contributions to retirement savings were not improper self-dealing, I see no basis in this record to compensate HCW for amounts the Banoubs diverted from their own salary for retirement savings. The claim fails for want of proof.

### c. Citizens Bank Withdrawals as Salary

Tanyous claims the Banoubs improperly withdrew $5,144.09 ($5,044.09 from HCW's Citizens Bank commercial account and $100 from HCW's payroll account) on July 18, 2008, following the Court's decision that Tanyous was the controlling shareholder of HCW.[155] According to Tanyous, these withdrawals were a wrongful conversion of funds for unearned salary. The Banoubs counter that the evidence does not support the claim that the withdrawals were improper.[156] In particular, they point to a July 2008 monthly account statement from Citizens Bank showing the

---

[154] D.I. 387, Ex. 7; *see also* JX 82 at 11 ("We were unable to determine from the records provided, the aggregate amount to withholdings versus company matching contributions to the retirement plan.").

[155] PTO at 10, ¶ 13(a); Tanyous' Post-Trial Opening Br. at 17 (D.I. 397).

[156] Banoubs' Post-Trial Opening Br. at 13–14.

$5,044.09 withdrawal from HCW's money market account.[157]  The statement also shows a deposit that same day into HCW's checking account for $5,144.09.[158]  From that checking account, the Banoubs attempted to cash their past paychecks for amounts already included in Tanyous' claim for excessive salary.

The Banoubs' position here is supported by the preponderance of evidence. The temporal proximity of the withdrawal and deposit, and the corresponding amounts involved in the transactions, supports the Banoubs' testimony that the transactions involve the same money.  Because Tanyous' claimed damages of $5,144.09 is subsumed within the Damages Report's excess salary numbers, I see no basis in the evidence or law to double-count that amount.

*  *  *  *  *

To reiterate, I have determined the Banoubs properly drew a salary of $354,516.50.  The Damages Report sets the total salary drawn by the Banoubs from 2002 to 2008 at $403,744.  The Banoubs contest the arithmetic behind this figure, arguing that Ford double-counted in the course of his calculation.  But while Ford cites to the evidentiary record for his totals, the Banoubs cite to nothing; they simply assert there was overcounting.

---

[157] D.I. 387, Ex. 3.

[158] *Id.*  The extra $100 was obtained from closing the payroll account.  *Id.*

40

It bears repeating here that the evidentiary record on which I must base this decision is muddled. The Damages Report offers the clearest picture, although even that image is necessarily incomplete given the fragmented information supplied to Ford. With respect to the salary claim, the Banoubs bore the burden of proof for the reasons stated. They did not carry that burden. To assess damages, I rely on the Damages Report's $403,744 figure for actual salary drawn by the Banoubs, and subtract from that the $354,516.50 salary properly owed, to conclude that the Banoubs are liable to HCW for $49,228 as compensation-related damages.

### 3. Expense-Related Claims

The first category of expenditures for which Tanyous seeks damages is characterized in the Damages Report as "Alleged Unsubstantiated Expenses." Of course, the mere fact that an expense is unsubstantiated is not grounds for finding a fiduciary breach. Rather, Tanyous must present substantial evidence of self-dealing to carry his *prima facie* burden before any burden shifts to the Banoubs as fiduciaries to justify the expenditures.[159] In most instances discussed below, Tanyous has failed to carry his threshold burden of proof.

---

[159] *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *15 (Del. Ch. May 31, 2000).

### a. The Banoubs' Personal Credit Card Payments

Tanyous' claims $178,929 for unsubstantiated disbursements from HCW to various financial institutions to pay-off credit card debt during the Banoub Era.[160] But Tanyous has failed to satisfy his burden to make a *prima facie* showing that the expenditures in question were self-interested in nature. No specific instance (or even indicia) of self-dealing was flagged in these payments. Indeed, the Damages Report recognizes "a portion of these credit card payments may be [legitimate] business expenses of HCW."[161]

In *Zutrau v. Jansing*, the court rejected a plaintiff's derivative claim for unsubstantiated credit card expenses when "neither side ha[d] submitted convincing evidence as to the nature of the[] expenses."[162] The court shifted the burden of proof to the defendant solely as a sanction for failure to comply with discovery obligations with respect to specifically requested credit card charges.[163] Here, Tanyous did not move to compel the production of the Banoubs' credit card records, presumably content to leave the evidentiary landscape barren under the misimpression that the

---

[160] PTO at 12, ¶ 13(i); Tanyous' Post-Trial Opening Br. at 8.

[161] JX 82 at 9.

[162] *Zutrau*, 2014 WL 3772859, at *27–28.

[163] *Id.* at *29–30.

Banoubs bore the initial burden to establish the propriety of those credit card charges.[164]

Because Tanyous did not submit any evidence suggesting the challenged credit card expenses were improper and did not vigorously pursue these records in discovery, he failed to shift to the Banoubs the burden of establishing their fairness. The claim fails for want of proof.

### b. Automobile Related Expenses

Tanyous claims $52,990 for unauthorized automobile expenses charged by the Banoubs to HCW.[165] The Banoubs maintain these expenses were products of legitimate business decisions that are entitled to protection under the business judgment rule.[166]

The Banoubs stand on both sides of the transactions for automobiles they bought and then drove, so they bear the burden of establishing entire fairness.[167]

---

[164] While Tanyous requested credit card records from the Banoubs, he made no effort to follow up on those requests and, instead, subpoenaed the records directly from third-party banks. D.I. 410. This does not, on its own, shift the burden to the Banoubs to prove the entire fairness of the card expenses.

[165] Tanyous' Post-Trial Opening Br. at 8–9; PTO at 12, ¶ 13(j).

[166] Banoubs' Post-Trial Opening Br. at 5–6; *see also* Tr. 468–71 (Medhat) (describing his business rationale for purchasing the automobiles).

[167] *See Cancan Dev.*, 2015 WL 3400789, at *16 ("Decisions by interested fiduciaries to reimburse their own expenses or provide themselves with other corporate benefits are similarly subject to entire fairness review.") (citing *Sutherland v. Sutherland*, 2009 WL 857468, at *4 n.16 (Del. Ch. Mar. 23, 2009)).

They admit they did not include Tanyous in the decision to purchase the vehicles in question.[168] But Tanyous signed off on the automobile expense in the same amended 2004 tax return where he approved the Banoubs' salary decisions prior to 2005.[169] That amended tax return showed HCW was paying notes on two vehicles and taking depreciation on one of them.[170] Because the amended 2004 tax return was subject to rigorous scrutiny by Tanyous, I am satisfied that the Banoubs' ostensibly self-interested decision to purchase the automobiles was ratified by Tanyous' uncoerced and fully informed approval of the transactions, and the business judgment rule applies.[171]

Under the business judgment rule, these automobiles were properly charged to HCW. In this regard, I find credible Medhat's testimony—corroborated by repair slips on these vehicles in 2005 and 2007 showing low mileage—that these vehicles made good business sense and were used primarily for commutes to and from the

---

[168] Tr. 470 (Medhat).

[169] JX 32.

[170] *Id.*; Tr. 337–42 (Medhat).

[171] *See generally Rosser v. New Valley Corp.*, 2000 WL 1206677, at *3–4 (Del. Ch. Aug. 15, 2000) (discussing shareholder ratification of allegedly conflicted transactions). Even if the transactions were reviewed for entire fairness, I am satisfied the Banoubs carried that burden. There is no evidence HCW overpaid for the vehicles. Nor is there evidence that HCW did not need or, through the Banoubs, use the vehicles for legitimate business purposes.

daycare and to transport food supplies and materials to the facility.[172] Deborah Clark offered credible testimony that Medhat often used the vehicles in his efforts to maintain the physical plant and to conduct other HCW business.[173] There is no credible evidence in the record to rebut that evidence. Nor is there evidence (or meaningful argument) regarding what did or should have happen(ed) to the vehicles after the Banoubs left the daycare in 2008. The claim fails for want of proof.

### c. Legal Expenses

Tanyous seeks $38,700 in legal expenses incurred by HCW during 2007 and 2008, when the Banoubs hired legal counsel to assist in the defense of Tanyous' Section 220 action.[174] A Section 220 demand is directed against the corporation, not the corporation's officers.[175] It is proper, then, that the corporation pay the legal fees incurred in connection with the company's response to a books and records demand. While Tanyous amended his pleadings after the trial to include a declaratory judgment claim, and to join Medhat as a defendant in order to resolve the dispute regarding Tanyous' equity stake in the Company, the case still proceeded as a

---

[172] Tr. 337–42 (Medhat); JX 26, 53 (Repair slips).

[173] Tr. 205 (Clark).

[174] PTO at 12, ¶ 13(d); *see also Tanyous v. Happy Child World, Inc.*, C.A. No. 2947-VCN.

[175] 8 *Del. C.* § 220.

Section 220 action.[176] Thus, I find all legal fees incurred by HCW up to the Court's July 17, 2008 post-trial opinion were properly charged to HCW.

This leaves one charge for legal fees of $2,500, dated December 17, 2008.[177] In the Banoubs' attorney's motion to withdraw, counsel stipulated that he had "finished up his work in the first action (preparing and filing a response to plaintiff's motion for costs in August)."[178] Counsel withdrew after advising the Banoubs that they would be responsible for fees incurred defending the plenary action, at which point the Banoubs elected to proceed *pro se*.[179]

After reviewing the evidence, I am satisfied the December 17 payment reflected services rendered by counsel to HCW as the Company wound down its obligations with respect to the Section 220 action (e.g., prevailing party costs, etc.). Tanyous' claim for reimbursement of legal expenses, therefore, fails for want of proof.

---

[176] Op. at *1.

[177] JX 82, Ex. E.

[178] Mot. to Withdraw Appearance, *supra* note 78.

[179] Tr. 345–46 (Medhat).

### d. Undocumented Reimbursements

Tanyous claims the Banoubs owe $19,947 in undocumented reimbursements in the form of 29 checks between May 2005 and October 2006.[180] The Banoubs counter that these reimbursements represented proper business expenses.[181]

While a reimbursement flowing from HCW to the Banoubs is self-dealing on its face, I am satisfied that the relatively minimal scope of these expenses, and the presence of supporting documentation for nearly all of them, suggests there is no need to shift the burden of proof to the Banoubs in this limited instance.[182] Indeed, only three of the challenged checks lack legends documenting the business-related expense for which the reimbursement was sought.[183] And the reimbursements amount to $1,108.17 per month, certainly reasonable as expenses incurred by a daycare business operating at full or near full capacity. The claim fails for want of proof.

---

[180] JX 82, Ex. F; PTO at 12, ¶ 13(k).

[181] Banoubs' Post-Trial Opening Br. at 9–11; Tr. 314–17 (Mariam); Tr. 346–49 (Medhat).

[182] *See Zutrau*, 2014 WL 3772859, at *28 ("Although [Defendant's] lack of formal expense reporting is far less than ideal, I find that the relatively minimal nature of the personal expenses that Jansing has been shown to have charged to the Company over a span of six years is not sufficient to warrant shifting the burden of proof to him.").

[183] JX 82, Ex. F.

### e. Past Due Payroll Taxes

Tanyous seeks to recover $11,809 for a tax penalty assessed against HCW after he assumed operational control of the business.[184] There is no proof the Banoubs received any personal benefit from the circumstances that gave rise to the penalty, and so there is no semblance of self-dealing. And Tanyous does not articulate a theory for recovery under a duty of care. Even if he did, this would not qualify as a duty of care breach because Medhat reasonably relied upon an advisor to address the daycare's taxes, which, by law, he was entitled to do.[185] For that reason, the claim fails for want of proof.

### 4. Revenue-Related Claims

Tanyous asserts several claims for unrecorded or missing revenue based on the Damages Report. The claims amount to $147,443 and consist of unrecorded cash receipts, unremitted tuition deposits, and unremitted tuition payments from the Banoubs for time their children attended the daycare. All of these claims depend on the same false premise that Tanyous need not provide any evidence of self-dealing in order to hold the Banoubs to account for the speculated amounts allegedly due.

---

[184] PTO at 11, ¶ 13(e); Tanyous' Post-Trial Opening Br. at 22–23.

[185] Tr. 350–52 (Medhat); *see also* 8 *Del. C.* § 141(e); *Aronson*, 473 A.2d at 812.

### a. Unrecorded Cash Receipts

Tanyous claims HCW is owed $73,800 in unrecorded cash receipts.[186] The absence of cash receipts is not self-dealing on its face, so Tanyous must make a *prima facie* showing based on substantial evidence that the Banoubs duty of loyalty is implicated. Tanyous fails to meet that burden. The Damages Report on which Tanyous relies bases its calculation of damages on an estimate of one year (2006) of revenues that is then carried backwards and projected forwards over the course of the Banoub Era.[187] It is difficult to discern from this "evidence" whether HCW was even missing cash receipts, much less where that missing cash may have gone.[188]

Even if cash receipts are, in fact, unaccounted for, Tanyous must set forth some evidence of self-dealing to shift the burden to account for the receipts onto the Banoubs. He has presented no such evidence. The only link to Medhat is the Damages Report's cross-reference to Medhat's personal bank account, and a note that there were deposits made between 2002 and 2007 into Medhat's savings

---

[186] PTO at 11, ¶ 13(c); Tanyous' Post-Trial Opening Br. at 29–30.

[187] JX 82 at 18–19.

[188] Indeed, HCW used a software program—Procare—to track how much each parent had paid by cash or by check, and at year end provided parents with reports of their payments. *See* JX 24, 157; Tr. 277–367 (Mariam); Tr. 360–61 (Medhat). There is no evidence from Procare that HCW was missing receipts.

account.[189]  The fact Medhat was making deposits to savings is hardly incriminating evidence given that Medhat was working another job at the time.  This is precisely the sort of speculative claim of wrongdoing this court has rejected for failing to establish a *prima facie* showing of self-dealing.[190]  The claim fails for want of proof.

### b.  Unremitted Tuition Deposits

Tanyous stakes the same ground for his argument concerning $17,940 in allegedly unremitted tuition deposits.[191]  HCW policy required parents to make a two-week deposit before their children started at HCW.[192]  Tanyous asserts these deposits should have been stored in escrow and that, because no escrow existed when he assumed operations, the Banoubs must be held to account for "missing" tuition deposits calculated based on the number of students at the center.[193]

Again, Tanyous fails to carry his initial burden.  Not only is there no evidence of self-dealing to support these claims, there is no evidence of the need for an escrow

---

[189] Ex. 82 at 19.

[190] *See, e.g.*, *Avande*, 2019 WL 3800168, at *12–13 (refusing to hold a fiduciary to account for expenses where the plaintiff "ha[d] not provided substantial evidence that the transactions making up the Challenged Amount, which likely consist of thousands of individual expenditures incurred over a span of more than five years, constitute self-interested transactions involving [the defendant]").

[191] PTO at 13, ¶ 13(o); Tanyous' Post-Trial Opening Br. at 25–26.

[192] JX 16.

[193] PTO at 13, ¶ 13(o); Tanyous' Post-Trial Opening Br. at 25.

account at all. The relevant company policy states that "one week's advance tuition will be applied to the child's first week. The remaining advance tuition will be applied to the child's last week, provided that the center is given a two weeks advance notice of the child's withdrawal."[194] In other words, the advance tuition payments were nonrefundable.[195] Because HCW was entitled to those funds upon payment, it had no need to hold them in escrow. There is no proof of self-dealing. Consequently, the claim fails for want of proof.

### c. Unremitted Tuition Payments for the Banoubs' Children

Finally, Tanyous alleges the Banoubs' two children attended HCW from 2002 to 2008, and yet the Banoubs never paid their tuition. Tanyous seeks payment for the Banoubs' unremitted tuition payments, totaling $39,503.[196]

Again, Tanyous bears the initial burden to present a *prima facie* claim based on substantial evidence of self-dealing. To this end, he offers the testimony of a single witness, Ms. Hofmann, along with a one-day entry on a Food Program record in 2006 revealing that the Banoubs' children were served lunch at the daycare on that day.[197]

---

[194] JX 16.

[195] Tr. 270–71 (Mariam).

[196] PTO at 11, ¶ 13(h); Tanyous' Post-Trial Opening Br. at 26–27.

[197] JX 82 at 26.

51

Here again, the evidence is insufficient to shift the burden of proof to the Banoubs. Ms. Hofmann's testimony regarding the Banoubs' presence at HCW was earlier contradicted by Deborah Clark—a more credible witness.[198] This casts doubt upon the reliability of all aspects of Hoffman's testimony.[199] And the existence of a single entry on a Food Program record is insufficient to prove that the Banoubs' allowed their children to attend the daycare without paying the employee tuition rate. Indeed, Mariam credibly testified that her children were likely on-site because they were scheduled for a doctor's visit that day at the hospital across the street.[200] Moreover, if the Banoubs' children actually attended HCW, then their names would appear on various records, such as classroom lists, attendance sheets, and tracking sheets listing the other students. There are no such references. The claim fails for want of proof.

---

[198] *See Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 35 (Del. 2005) ("[T]he Court of Chancery is the sole judge of the credibility of live witness testimony.") (internal quotation omitted) ("Cede III").

[199] *See, e.g.*, *Manichaean Capital, LLC v. SourceHOV Hldgs., Inc.*, 2020 WL 496606, at *19–21 (Del. Ch. Jan. 30, 2020) (discounting a witness's entire testimony after finding parts of the testimony demonstrably not credible).

[200] Tr. 286–87 (Mariam).

### 5. Suggestions of Additional Damages

Finally, Tanyous asserts the Banoubs misappropriated HCW funds totaling $119,493 in order to acquire two properties and to support their competing daycare, HKA. I address the claims in turn.

### a. The Newark Personal Residence

Tanyous claims HCW is entitled to recoup $26,329 after the Banoubs converted these funds to purchase their home in Newark, Delaware.[201] The Damages Report observes that Tanyous' initial capital contribution to the Banoubs in February and June of 2001—$20,000 wired to the Banoubs' personal bank account and a check for $80,000 deposited in HCW's newly-created business account—was soon followed by the Banoubs' purchase of their suburban home with a $14,596.12 cash down payment.[202] Because Tanyous' $20,000 wire was in the Banoubs' personal account when the Banoubs purchased this home, the Damages Report states, "it could be concluded that the Banoubs used the capital contribution from Tanyous as a source of funds for the purchase."[203]

Since the Banoubs exercised exclusive control over HCW funds that were transferred into their personal account, they bear the burden to prove those funds

---

[201] PTO at 11, ¶ 13(f); Tanyous' Post-Trial Opening Br. at 33.

[202] JX 82 at 30–31.

[203] *Id.* at 31.

were used properly.[204]  In this instance, the Banoubs carried that burden.  Because money is fungible, the Banoubs can only demonstrate that HCW funds were not used in the purchase of their Newark home by showing that their remaining balance covered the amount earmarked for HCW purposes.  The Banoubs had a total of $39,742.74 in their personal accounts after Tanyous' $20,000 infusion.[205]  Thus, they had $19,742.74 of their own money on hand for the $14,596.12 down payment on the Newark property.  After closing on the home in July 2001, the Banoubs had a total of $25,182.47 in their personal account—more than enough to fund the cash component of the HCW acquisition or to refund the cash to Tanyous had he ever asked for it.[206]

There is no claim that the Banoubs used Tanyous' initial cash infusion for some other improper purpose; the focus at trial was on the Banoubs' alleged misappropriation of Tanyous' money to fund the purchase of real property.  Because the preponderance of the evidence reveals that HCW funds were not used in the purchase of the Banoubs' home, the claim fails for want of proof.

---

[204] *Cf. Technicorp*, 2000 WL 713750, at *20 (holding fiduciary defendant exercising exclusive control over company cash deposited into his personal account bore the burden of demonstrating the cash was used for proper business purposes).

[205] JX 1 (Wilm. Trust Feb. 2001 statement).

[206] JX 4 (Wilm. Trust July 2001 statement).

### b. The Newark Investment Property

Tanyous next claims the Banoubs used HCW funds ($23,856.83) to fund a down payment on a personal investment property in Newark, Delaware.[207] In February of 2004, the Banoubs moved $35,600 from HCW's Money Market account to the Banoubs' personal account.[208] Two months later, in April 2004, the Banoubs made a $23,856.83 down payment on the investment property.[209] The Damages Report states, "[b]ased upon the large amounts of HCW funds moved in and out of the Banoubs' personal accounts, it could be concluded that the source of the funds used at settlement for the [investment] property came indirectly from HCW."[210] The Banoubs claim that, even if some HCW funds were mixed in their personal account at the time of the purchase, their account balance of $48,048.97 was comprised of more than enough of their personal funds to cover the $23,820.83 down payment on the investment property.[211]

The Banoubs' unilateral transfer of corporate funds into their personal bank account is self-dealing on its face, so the Banoubs bear the burden to show those

---

[207] PTO at 11, ¶ 13(g); Tanyous' Post-Trial Opening Br. at 28.

[208] JX 82 at 32–33.

[209] *Id.*

[210] *Id.* at 33.

[211] JX 22.

funds were not misappropriated. With respect to the investment property, they have not carried that burden. Unlike the purchase of their personal residence, the Banoubs' personal account did not have sufficient funds to cover the down payment on the investment property without HCW's money. Excluding the $35,600 transfer from HCW, the Banoubs had only $13,048.97 of personal funds in their account—$10,771.86 shy of the $23,820.83 needed for the down payment on the investment property. The Banoubs failed to demonstrate that the $35,600 transfer from HCW was no longer in their personal account at the time they acquired their investment property. HCW funds, therefore, are implicated in that transaction.

Because the Banoubs failed to satisfy their burden of proof and their duty to account, they failed to show the fairness of the transaction, and damages must be assessed. Here again, the Court has broad power to fashion a remedy in equity.[212]

Tanyous asks the Court to disgorge profits from the investment property based on a calculation of the funds appropriated ($23,857.82) and interest ($5,009.93) calculated by a 3.5% simple interest rate over 70 months, plus estimated rental value ($38,513.98) and interest at the same rate ($1,322.71). The proffered rental amount is entirely speculative without any evidentiary support, so I disregard it completely.

---

[212] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) ("[W]e do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate."); *Julian*, 2008 WL 2673300, at *19 ("When a transaction does not meet the entire fairness standard, the Court of Chancery may fashion any form of equitable and monetary relief as may be appropriate.").

I also find that a calculation of damages based on all the transferred funds is inappropriate here, where the credible evidence leads me to conclude that only $10,771.86 of HCW's funds were misappropriated.[213]

After carefully considering the evidence, I find damages are equal to the amount of funds proven to be misappropriated, plus interest (as laid out in the Damages Report).[214] The table below computes the damages:

**Interest on $10,771.86 from 4/21/2005 - 3/1/2010**

| | | |
|---|---|---|
| 2004 | $ | 251.34 |
| 2005 | $ | 377.02 |
| 2006 | $ | 377.02 |
| 2007 | $ | 377.02 |
| 2008 | $ | 377.02 |
| 2009 | $ | 377.02 |
| 2010 | $ | 62.84 |
| **Total Interest** | $ | 2,199.25 |
| HCW Funds | $ | 10,771.86 |
| **Damages** | $ | 12,971.11 |

The Banoubs are liable to HCW for $12,971.11, representing funds misappropriated from HCW to purchase their investment property.

---

[213] JX 22; Tr. 370–71 (Medhat); JX 82 at 33. I note again that the claim of misappropriation here focused solely on the use of HCW funds to acquire a personal investment property. And given the propensity of both of HCW's owners to draw from HCW to suit their own needs, I see no basis in equity to order disgorgement of profits from the investment property.

[214] JX 82 at 32–33, Ex. P.

### c. HKA

Finally, Tanyous brings a claim for several disbursements from HCW to HKA totaling $24,000 during July 2006, as purportedly reflected in the Banoubs' personal bank account.[215]  The Banoubs admit Medhat mistakenly effected three online transfers from HCW to HKA accounts in July, 2006.[216]  Because the Banoubs exercised exclusive control over these accounts and stood on both sides of the transaction, they have the burden to prove the transactions were entirely fair to HCW.

The Banoubs successfully carry that burden here.  Tanyous' claim is based on his allegation that net transfers to the Banoubs' personal accounts were, at that time, unfavorable to HCW.  This allegation, in turn, was based on Exhibit H of the Damages Report, documenting a net gain of $17,200 to the Banoubs' personal account.[217]  But Tanyous dropped his claim for net transfer payments owed by the Banoubs to HCW when he discovered records that revealed the Banoubs did not, in fact, come out ahead on those transfers.[218]  Even so, Tanyous presses on with this claim under the theory that the Banoubs must show that these specific funds were

---

[215] JX 82 at 34, Ex. H; PTO at 13, ¶ 13(p).

[216] Banoubs' Post-Trial Answering Br. at 23 (D.I. 403).

[217] JX 82, Ex. H.

[218] Tanyous' Post-Trial Answering Br. at 10.

returned to HCW.[219]  The claim is difficult to follow, much less assess in the evidence.  In any event, Medhat testified convincingly that the evidence upon which Ford relied to "flag" this issue was the product of recordkeeping errors on Medhat's part.[220]  After reviewing the evidence, I share that view and draw a reasonable inference that these funds, in fact, were returned to HCW, as the Banoubs say they were.[221]  The claim fails for want of proof.

### 6.  Records Recreation Expenses

Tanyous claims $87,276 for the amount paid to Ford's firm to "reconstruct the records to continue [HCW's] day to day operations," again under a theory that the expenses were the proximate result of a breach of fiduciary duties.[222]  The central premise behind that claim is that HCW business records were either taken, lost, or destroyed by the Banoubs.[223]  Tanyous leaves unclear what particular duty he

---

[219] Tr. 94 (Ford) (stopping short of opining that funds "that went to Happy Kids" were misappropriated from HCW, and noting that he "felt we needed to this matter to the Court and say, you know, it's out there").

[220] Tr. 425 (Medhat).

[221] Tr. 411, 425 (Medhat).

[222] PTO at 13–14, ¶¶ 2–3; Tanyous' Post-Trial Opening Br. at 34–35.

[223] Tr. 533–38 (Tanyous).

believes is breached.  Because he did not brief any duty of care claim, I deem that claim either waived, withdrawn or never asserted.[224]

While the Court previously observed that the "unfortunate state of the Company's books is largely Medhat's own doing,"[225] that observation does not equate to a finding that the absence of proper records is a product of actionable wrongdoing.  The only testimony that addresses purportedly missing records comes from Girgis, Guirguis, and Hofmann.[226]  That testimony, in my view, was not credible, particularly given that HCW had a security system in place at the time the Banoubs allegedly made off with HCW records, and yet Tanyous (who controlled the system) did not produce videos or reports from that system.[227]  The Banoubs, on the other hand, were credible in their adamant denials when asked if they misappropriated HCW's records.[228]  Finally, the record is entirely unclear as to why the financial software used by HCW could not reproduce the supposedly missing

---

[224] *See Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[225] Op. at *2.

[226] D.I. 383 (Hofmann) 20–21; *see also* Tr. 539–40 (Tanyous) (testifying that Girgis and his wife, Guirguis, informed him of missing records).

[227] JX 25; Tr. 246–80 (Mariam); Tr. 429–57 (Medhat).  The system tracks who "swipes" in and out of the building and notes the corresponding time, and can produce videos of the comings and goings if prompted to do so.  Tr. 249–50 (Mariam); Tr. 440–44 (Medhat).

[228] Tr. 445–49, 498–502 (Medhat); Tr. 286–69 (Mariam).

records.[229]  In this regard, I note that Tanyous' own inability to keep track of HCW records does not instill confidence that his sense of what records exist, and what records are missing, comports with reality.[230]  The records recreation claim fails for want of proof.

### 7.  The Banoubs' Counterclaim

The Banoubs counterclaim for a declaration that they may negotiate twelve HCW uncashed paychecks for work they performed while operating the daycare.[231] The Banoubs also seek the return of funds they allegedly loaned to HCW after April 2007 that were not tallied in the Damages Report.[232]  They characterize these claims as "setoffs" to Tanyous' fiduciary breach claims "in the nature of an affirmative defense."[233]  "Set-off is a mode of defense by which the defendant acknowledges the

---

[229] *See* JX 157 (showing receipts for "Procare" software); JX 24 (advertising "Procare" software's capabilities, including tracking accounting, tuition expenses, employee data and payroll).

[230] JX 156.

[231] Banoubs' Post-Trial Opening Br. at 14 n.4, 33.

[232] JX 82, Ex. H; 2d Am. Countercl. at ¶ 13 (D.I. 239).

[233] *Tanyous v. Banoub*, 2012 WL 1526873, at *1 (Del. Ch. Apr. 26, 2012).

justice of the plaintiff's demand, but sets up a defense of his own against the plaintiff, to counterbalance it either in whole or in part."[234]

With respect to the uncashed paychecks, the Banoubs have failed to enter those paychecks into evidence or otherwise support their claim with competent evidence. The claim fails, therefore, for want of proof.

The Banoubs' claim for $7,200 in loans likewise fails because they have not provided any accounting for what these loans represented, nor did they prove the actual source of the funds in order to prove that a loan, in fact, occurred.[235] The Banoubs admit they often intermingled HCW funds with personal funds in their accounts. Without clear evidence that loans were even made, much less any details regarding the loans, the claim fails for want of proof.

*****

To recount, I have found the Banoubs are liable to HCW for (1) $49,228 in compensation-related damages; and (2) $12,971.11 for misappropriated funds, totaling $62,199.11. The value of these claims will be incorporated in the appraisal, as discussed below. I have also found the Banoubs failed to prove their "set-off" counterclaims.

---

[234] *Finger Lakes Capital P'rs, LLC v. Honeoye Lake Acq., LLC*, 151 A.3d 450, 453 (Del. 2016) (quoting Victor B. Woolley, *Practice in Civil Actions and Proceedings in the Law Courts of the State of Delaware* § 492 (1906)).

[235] Banoubs' Post-Trial Opening Br. at 12–13, 28 (citing JX 50).

## C. The Banoubs' Derivative Claims

The Banoubs have asserted counterclaims against Tanyous for breaches of fiduciary duties and misappropriation prior to the Merger. "[B]reach of fiduciary duty claims that do not arise from the merger are corporate assets that may be included in the determination of fair value."[236] None of the claims arise from the Merger. As discussed below, the value of the proven claims, therefore, will be incorporated in the appraisal along with the value of HCW's proven claims against the Banoubs. Three of the four claims against Tanyous implicate the duty of loyalty, while the last implicates the duty of care.

### 1. The Duty of Loyalty Claims

The Banoubs challenge three specific transactions. First, it is alleged that Tanyous' wife withdrew $14,750 from the HCW's accounts between June 7 and July 15, 2011 for personal use.[237] Second, it is alleged that Guirguis drew salary totaling $1,349.19 from HCW when Tanyous testified she did not work at HCW.[238] Third, it is alleged that Tanyous caused $4,000 to be wrongfully diverted from HCW

---

[236] *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 1994 WL 198726, at *3 (Del. Ch. May 16, 1994); *see also Nagy*, 770 A.2d at 55–56 (noting the appraiser must value breach of fiduciary claims as these claims are "part of the going concern value of the corporation").

[237] JX 61.

[238] D.I. 386 (Tanyous Dep.) 80–81.

to Little Scholar, Tanyous' solely owned daycare.[239]  In total, these claims amount to $20,099.19.

Tanyous did not rebut any of these three claims on their merits or argue that they were not instances of self-dealing.  Rather, his defense rests on the notion that the Banoubs lack standing to bring derivative claims after the Merger or, alternatively, that the Banoubs' expert's failure to value their derivative claim means they cannot sustain their burden to prove them.  Neither defense withstands scrutiny.

*First*, HCW's claims against Tanyous were HCW assets as of the Merger Date and may be considered as a "relevant factor" in the Court's appraisal.  Tanyous acknowledged as much before trial.[240]  Even if the Court were to countenance Tanyous' post-trial change of position, the new position fails on the merits. To ignore the value of these claims, all of which were available to HCW as of the Merger, would be to ignore both HCW's pre-Merger "operative reality" and all relevant factors that inform the appraisal of HCW's fair value.[241]  It would also deprive the Court of important evidence regarding the fairness of the Merger price

---

[239] Banoubs' Post-Trial Opening Br. at 41 (citing JX 61).

[240] PTO at 2.

[241] *See M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525 (Del. 1999) (noting that, in an appraisal proceeding, the "corporation must be valued as a going concern based upon the 'operative reality' of the company as of the time of the merger") (citation omitted).

(an issue squarely before the Court in the context of this squeeze-out merger, as discussed below).[242]

*Second*, Tanyous points to no authority for the proposition that a petitioner's expert must testify as to the value of derivative claims in order for the court to consider that value in its appraisal. If the record contains competent non-expert evidence from which the Court can reliably value a derivative claim, no expert testimony is required. Indeed, in this case, the Court has adjudicated the claims and has set their value. No expert input (beyond Tanyous' Damages Report) was (or is) required to make those findings.

Turning to the merits, each of the claims involve self-dealing on their face; thus, Tanyous bears the burden to prove entire fairness. Tanyous admits that the withdrawals at issue were undocumented[243] and, while some evidence suggested Guirguis was principally operating HCW while Tanyous was abroad, Tanyous was adamant in his testimony that she "has nothing to do with the daycare. She is solely

---

[242] *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1250–51 (Del. 2016) (observing that a cashed-out equity holder has standing "to challenge the fairness of the merger by alleging that the value of his [derivative] claims was not reflected in the merger consideration"); *Del. Open MRI*, 898 A.2d at 311 (holding that the court should engage in an entire fairness review of the squeeze-out merger when conducting a post-merger statutory appraisal).

[243] D.I. 416.

my wife . . . and has nothing to do with the business."[244]  Tanyous similarly fails to justify the $4,000 transferred from HCW to Tanyous' solely-owned Little Scholars.[245]  Because Tanyous has failed to demonstrate the entire fairness of the self-dealing transactions, the claims for breach of fiduciary relating to those transactions are both factually and legally sound.  Their value, for appraisal purposes, is $20,099.19.

## 2. The Duty of Care Claim

The Banoubs claim that Tanyous grossly mismanaged HCW.  Gross mismanagement, as alleged here, is a duty of care claim.[246]

The fiduciary duty of care mandates that directors of Delaware corporations act in good faith and "consider all material information reasonably available in making business decisions."[247]  "[D]uty of care violations are actionable only if the

---

[244] D.I. 386 (Tanyous Dep.) 80–81.  *See also* Tr. 570–71 (Tanyous) (when confronted, Tanyous was unable to explain his wife's withdrawals from HCW accounts).

[245] *See Technicorp*, 2000 WL 713750, at *15 (finding plaintiffs "made a *prime facie* showing" that the defendants diverted almost $12 million from a plaintiff's company while that company was under the defendants' exclusive control).

[246] *See In re Citigroup Inc.*, 964 A.2d at 114 n.6 ("Delaware law does not recognize an independent cause of action against corporate directors and officers for reckless and gross mismanagement; such claims are treated as claims for breach of fiduciary duty.").

[247] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 747 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (quoting *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000)) (internal quotations omitted).

directors acted with gross negligence."[248]  Under our fiduciary law, gross negligence means "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[249]  As former-Chancellor Allen explained:

> [C]ompliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith *or* rationality of the process employed.  That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests.[250]

The Banoubs rely on two facts to support their claim that Tanyous' mismanagement breached his fiduciary duty of care to HCW.  First, HCW receipts fell $108,119 (from $462,035 to $353,916) in 2009, and another $51,543 (from $353,916 to $302,373) in 2010.[251]  Second, HCW failed to comply with

---

[248] *Id.* at 750.

[249] *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) (internal quotations omitted).

[250] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (emphasis in original).

[251] Tanyous' Post-Trial Opening Br. at 35 n.122 (citing JX 147).

regulatory requirements, as revealed in "lack of supervision, incorrect child staff ratio and safety issues."[252]

The Banoubs' duty of care claims fail because there is no evidence in this record that the corporate setbacks the Banoubs have identified were products of irrational processes or bad faith.[253] By asking the Court to infer a breach of Tanyous' duty of care from HCW's poor business performance, the Banoubs urge the Court to engage in precisely the sort of "substantive [judicial] second guessing" that our law forbids.[254] The claim fails for want of proof.

## D. The Appraisal

The Banoubs seek an appraisal of the fair value of their common stock in HCW. One month prior to the Merger Date, HCW's equity was valued by an independent appraiser (Ford) at $85,357, or $157.80 per share.[255] Tanyous maintains that price was fair, and Ford defended his valuation as an expert witness at trial.[256]

---

[252] JX 70, 74–76, 79, 86, 88, 90, 99, 110, 111.

[253] *In re Caremark*, 698 A.2d at 967.

[254] *Id.* As an aside, I note that in 2007—the year *before* Tanyous took over—HCW operated at a net loss of $74,808. JX 147, Ex. B.

[255] JX 147.

[256] *Id.* Ford holds a BS in accounting from the University of Delaware, an MS in taxation from Widener University, and is a Certified Public Accountant. Tr. 56 (Ford). In addition to being well-credentialed, he presented as a credible witness.

The Banoubs presented their own expert witness, Victor S. Pelillo,[257] who opined that the "fair market value" of HCW's equity, as of December 31, 2008, was $790,552, or $7,905.52 per share.[258]

I have conducted my appraisal analysis in four steps. *First*, I review the legal framework by which I am bound to conduct the appraisal in the context of this squeeze-out Merger. *Second*, I assess the value of HCW's non-litigation assets. In doing so, as I must, I evaluate the fairness of the Merger process and the Merger price. *Third*, I incorporate the value of HCW's litigation assets, as determined above, into the fair value appraisal. *Fourth*, I adjust the Banoubs' fair value appraisal award to account for their liability on HCW's derivative claims against them. I address each step *seriatim*.

## 1. The Appraisal Standards Following a Squeeze-Out Merger

The resolution of the Banoubs' statutory appraisal claim is complicated by their additional equitable entire fairness claim, prompted by the squeeze-out Merger initiated unilaterally by a controlling shareholder. While the analytical rubrics for each issue (merger fairness and appraisal) differ, both ultimately call the same

---

[257] JX 160. Pelillo holds a BA in Accounting from Pace University and is a Certified Public Accountant. JX 162. While I have no doubt he was sincere in rendering his opinions, for reasons explained below, his methodology here was not reliable in that it was not suited for the task at hand.

[258] Tr. 389, 401 (Pelillo).

question, namely, whether the Merger price was fair.[259]  Even so, when conducting

an appraisal following a squeeze-out merger alleged to be the product of an unfair

process, the Court must "address each claim on its own distinct terms."[260]

The Delaware appraisal statute "provide[s] equitable relief for shareholders

dissenting from a merger on grounds of inadequacy of the offering price."[261]

The statute directs the court to:

> determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value.  In determining such fair value, the Court shall take into account all relevant factors.[262]

The statutory concept of "fair value . . . is not equivalent to the economic

concept of fair market value."[263]  Rather, fair value is a jurisprudential construct

meant to capture "the value of the company as a going concern, rather than its value

---

[259] *See Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994) ("[T]he exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness"); *accord In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *5 (Del. Ch. Jan. 5, 2010); *Del. Open MRI*, 898 A.2d at 310.

[260] *Del. Open MRI*, 898 A.2d at 310.

[261] *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988) ("Cede I").

[262] 8 *Del. C*. § 262(h).

[263] *Merion Capital L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *13 (Del. Ch. Dec. 16, 2016) (quotation and citation omitted).

to a third party as an acquisition."[264]  A court tasked with determining fair value is "not to find the actual real world economic value of [parties'] shares, but instead to determine the value of the [parties'] shares on the assumption that they are entitled to a *pro rata* interest in the value of the firm when considered as a going concern, specifically recognizing its market position and future prospects."[265]

While judges of this court have "significant discretion" to determine fair value in the context of an appraisal action,[266] the statutory direction to consider "all relevant factors" is well-understood to mean the court should consider "all generally accepted techniques of valuation used in the financial community" to the extent those techniques have been proffered by the parties through competent evidence.[267]  After giving due consideration to that evidence, "it is entirely proper for the [court] to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record."[268]

---

[264] *Del. Open MRI*, 898 A.2d at 310; *see also Glassman v. Unocal Expl. Corp.*, 777 A.2d 242, 246 (Del. 2001).

[265] *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *12 (Del. Ch. Apr. 25, 2005) (citations omitted).

[266] *Golden Telecom, Inc. v. Glob. GT LP*, 11 A.3d 214, 218 (Del. 2010).

[267] *Cede I*, 542 A.2d at 1186–87 (citing *Weinberger*, 457 A.2d at 712–13).

[268] *M.G. Bancorporation*, 737 A.2d at 526.

While a statutory appraisal typically places upon both parties "the burden of establishing fair value by a preponderance of the evidence,"[269] a squeeze-out merger, such as occurred here, triggers a slightly different allocation of burdens. Because the Merger is self-dealing on its face, Tanyous bears the burden to show that the process leading to the Merger and the price it yielded were entirely fair to the minority.[270] As noted above, a showing of entire fairness involves procedural fairness in the party's dealing (e.g., the transaction's timing, initiation, structure, negotiation, disclosure and approval) as well as fair price (i.e., all elements of value).[271] While this court has observed that "the overriding consideration" in these inquiries tends to be whether the transaction's price was fair, the questions triggered by entire fairness review must be examined holistically.[272]

### 2. The Merger Process

Tanyous effected the Merger of HCW into HCWA without a meeting by delivering his own written consent, as was his right under Section 228 of the

---

[269] *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *16 (Del. Ch. Jan. 30, 2015) (citing *Huff Fund Inv. P'ship v. CKX, Inc.*, 2013 WL 5878807, at *9 (Del. Ch. Nov. 1, 2013)).

[270] *Del. Open MRI*, 898 A.2d at 310–11.

[271] *Glassman*, 777 A.2d at 246.

[272] *Del. Open MRI*, 898 A.2d at 311.

DGCL.[273]  He did not attempt to "temper" or "eliminate" the "application of the entire fairness standard" by employing a special committee of disinterested directors to negotiate the Merger or subjecting the Merger to a majority-of-the-minority stockholder vote.[274]  These undisputed facts, however, standing alone, are not evidence of unfairness.[275]  A squeeze-out merger under circumstances like those attending the Merger of this closely held corporation, effected with the assistance of an independent appraiser to ensure that fair value is paid to the minority, typically will satisfy both the process and price prongs of entire fairness.[276]

Tanyous retained an independent appraiser, Ford, to provide valuation input in advance of the Merger.  Thus, the critical question is whether Tanyous' expert provided a fair valuation.[277]  If the valuation was too low, as the Banoubs contend, then Tanyous will have failed to meet his burden to prove that the Merger was entirely fair.[278]

---

[273] PTO at 6, ¶ 1.

[274] *Del. Open MRI*, 898 A.2d at 311.

[275] *Id.* at 312.

[276] *Id.*

[277] *Id.*

[278] *Id.*

### 3. The Merger Price Does Not Reflect HCW's Fair Value

The Banoubs attack Ford's appraisal at the time of the Merger in two respects. First, they claim Ford's valuation is flawed for the simple reason that it differs from their own expert's valuation. Second, they take issue with various decisions Ford made in the course of conducting his valuation. I address both criticisms in turn.

### a. The Experts' Valuations

Even when conducting an appraisal through the lens of entire fairness review, the Court must come to its own determination of fair value. To that end, in the course of evaluating the parties' competing expert valuations, "[t]he Court may . . . select the most representative analysis, and then make appropriate adjustments to the resulting valuation."[279] In situations involving small closely held companies, like HCW, "the absence of both market information about the subject company and good public comparables force the court to rely even more than is customary on the testimonial experts. That reality is inescapable."[280]

In preparing his pre-Merger valuation, Ford employed three separate methodologies: (i) the Capitalization of Earnings ("CE") method, (ii) the Net Asset

---

[279] *In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *20 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part sub nom. Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. 2017).

[280] *Del. Open MRI*, 898 A.2d at 331.

Value ("NAV") method, and (iii) the Transactions method.[281] The CE yielded an indicated equity value of $50,794, and the NAV yielded an indicated equity value of $119,920. The Transactions method, however, did not yield a useful result, as Ford concluded there were too few comparable businesses from which to derive a reliable estimate of HCW's fair value.[282] Accordingly, Ford based his conclusions exclusively on the CE and NAV valuations, considering the Transactions method only as a "sanity check" of the market multiples yielded by his other approaches.[283]

CE is an income-based valuation method that normalizes historical earnings to estimate the future earnings capacity of a company, and then capitalizes it to develop an enterprise value.[284] Ford derived the future earnings by calculating HCW's debt-free net cash flow from nine years of tax returns (2003 to 2011).[285] He then calculated the capitalization rate by subtracting HCW's long-term growth rate from the Company's discount rate.[286] Finally, he divided the debt-free net cash

---

[281] JX 147 at 9.

[282] *Id.* at 18.

[283] *Id.*

[284] *Id.* at 9. Ford explained that he chose the CE method over a Discounted Cash Flow ("DCF") method because DCFs rely on a company's projected results over several years, and HCW did not prepare cash flow projections. Tr. 98–113 (Ford).

[285] JX 147 at 10.

[286] *Id.* at 11.

flow figure by the computed capitalization rate to derive an enterprise value for

HCW of $461,210.[287]  After reducing this figure by HCW's interest-bearing debt,

Ford arrived at an indicated equity value of $50,794.[288]

In addition to his CE analysis, Ford engaged in a cost-based NAV analysis

because, at the time of his valuation, HCW was not operating as a childcare

provider.[289]  An NAV approach restates the assets and liabilities appearing on a

company's balance sheet to their fair market value, and then subtracts the fair market

value of a company's liabilities from the fair market value of its assets to determine

the company's net asset value.[290]

According to Ford, the "only significant asset" held by HCW as of

December 21, 2011, was a parcel of real estate with improvements.[291]  Real estate

appraisal expert Douglas L. Nickel was hired to value that asset.[292]  To do so, Nickel

employed two separate methodologies: the (i) Sales Comparison method and (ii) the

---

[287] *Id.* at 13–14.

[288] *Id.* at 14.

[289] *Id.* at 9.

[290] *Id.* at 7, 14.

[291] *Id.* at 15.

[292] *Id.*; *see also* JX 137.  Nickel holds a B.A. in economics from University of Richmond. Nickel is a licensed General Real Property Appraiser in the state of Delaware, a member of the Appraisal Institute, and a fellow at the Royal Institute of Chartered Surveyors. Tr. 13 (Nickel).

Income Capitalization method.[293] The former approach compares the sales prices of similar properties with the real estate to be valued; the latter approach analyzes the income-generating potential of the property and the anticipated rate of return to arrive at an estimated value for the property.[294] Nickel reconciled the difference between the sales approach and income capitalization approach by weighting them equally, calculating the market value of the real estate to be $530,000.[295]

With Nickel's valuation of HCW's property assets in hand, Ford then calculated the Company's liabilities.[296] He ultimately concluded that the total fair value of HCW's liabilities was $410,416.[297] Subtracting the cost of HCW's liabilities from its assets' value, Ford's cost approach yielded an NAV of $119,920.[298]

Ford reconciled his CE and NAV values by weighting them equally, yielding a fair value for HCW's equity of $85,357.[299] Because Ford reclassified certain

---

[293] JX 147 at 15.

[294] JX 137 at 4.

[295] *Id.* at 55.

[296] *See* JX 147 at 15–17.

[297] *Id.* at 16–17.

[298] *Id.* at 17.

[299] *Id.* at 19–20.

previously recorded shareholder loans to equity, the ultimate fair value of stock on a post-capitalization per share basis was determined to be $157.80.

The Banoubs' valuation expert, Pelillo, took a different tack. Pelillo "determined [total fair market value] on a going concern basis stated as the gross asset value of the Company's Tangible and Intangible Assets."[300] For reasons unclear, Pelillo conducted his valuation as of 2008, even though the Merger Date was August 6, 2012.[301] To calculate the value of HCW's tangible and intangible assets, Pelillo used an asset-based approach for the former and an income-based approach for the latter, adding both values together to reach his final value.[302]

Like Ford, Pelillo's asset valuation placed particular emphasis on pricing HCW's real estate. But, unlike Ford, Pelillo did not engage an expert real estate appraiser.[303] Instead, he relied on a 2009 appraisal of Happy Kids Academy

---

[300] *Id.*

[301] Of course, at the outset, it is clear Pelillo, who was engaged by the Banoubs when they were *pro se*, solved for the wrong problems—fair market value (as opposed to fair value) as of 2008 (as opposed to as of the Merger Date). *See Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 296 (Del. 1996) (emphasizing that the appraisal statute requires the court to appraise fair value "as of the date of the merger"); *Merion Capital L.P.*, 2016 WL 7324170, at *13 (noting that "fair value," in the statutory appraisal context, "is not equivalent to the economic concept of fair market value"). That Pelillo asked the wrong questions, as a matter of law, provides basis alone to discount, if not disregard entirely, his valuation opinions.

[302] Tr. 378–79 (Pelillo).

[303] Tr. 396–401 (Pelillo).

(not HCW), a June 2012 lease of the HCW property, and his own "drive by" appraisal of a residence on the HCW property.[304]  He projected the value of the property by applying a multiple to the lease, adding what he guessed to be the value of the residential property, and discounting that sum back to 2008.[305]  After other adjustments and subtracting the property's liabilities from its fair market value, Pelillo concluded that the fair market value of HCW's assets was $335,140.[306]  Summing his calculated fair market value of HCW's tangible and intangible assets, Pelillo concluded that the fair market value of HCW's assets were, as of December 31, 2008, $790,552.

Not surprisingly, I conclude that Ford's valuation analysis and trial testimony is more credible and reliable, for two primary reasons.  *First*, the two experts chose different dates on which to appraise the Company.  One (Ford) chose the right date; the other (Pelillo) chose the wrong date.[307]

---

[304] JX 160.

[305] *Id.* at 6.

[306] *Id.*

[307] 8 *Del. C.* § 262.  The Banoubs argue Tanyous' ongoing breach of fiduciary duty from 2008 through the Merger Date warrants backdating HCW's valuation to December 2008 as an equitable remedy for the breach.  Banoubs' Opening Post-Trial Br. at 47, 59. Of course, they cite no authority for this proposition.  In any event, to the extent claims for breach of fiduciary duty against Tanyous have been proven, the value of those claims as of the Merger have been incorporated in my appraisal as litigation assets belonging to HCW.

*Second*, Ford's approach to valuing HCW's principal asset, its real estate, was credible. Pelillo's approach was not. For his part, Ford recognized that his expertise was not in real estate valuation so he retained Nickel—an expert real estate appraiser—to perform the real estate valuation. Nickel went about his work using accepted methods, including a detailed comparable sales and lease transactions analysis.[308] Pelillo, by contrast, conducted the real estate appraisal himself even though he admittedly lacks that expertise.[309] He relied on a 2009 appraisal of a different daycare facility, a June 2012 lease of the HCW property, and his own "drive by" appraisal of HCW's on-premise owner's residence.[310] I have no confidence in these assessments. The utility of an appraisal of a single, separate comparable property is limited. The utility of a lease that may or may not cover an attached residence is questionable. The utility of a tack-on guess at the value of a residential property based on a "drive by" view of the property is nil.

After carefully considering the evidence, I find Pelillo's valuation an unsatisfactory rebuttal to Ford's substantially more reliable work. As I work through my own fair value analysis, then, I make reference (with occasional adjustments) to

---

[308] I discuss the reliability of Nickel's application of these accepted methods (and ultimate conclusions) below.

[309] Tr. 373–75 (Pelillo).

[310] JX 137.

Ford's valuation. In doing so, I pay special attention to those aspects of the Ford opinion the Banoubs identify as flawed, namely: (1) in the NAV analysis, Nickel's real estate appraisal; and (2) in the Capitalization of Earnings analysis, Ford's (i) cost of debt, (ii) cost of equity, and (iii) the relative weighting of the different analyses.

### b. The Asset-Based Fair Value of HCW

On a high level, the NAV model adjusts the appraised fair market value of a company's assets and subtracts the fair market value of its liabilities. Neither party disputes that Ford's calculation of total liabilities is reasonable and credible. Rather, the Banoubs take issue with Ford's calculation of the value of HCW's assets.

Specifically, the Banoubs maintain that Nickel, Ford's real estate appraiser, made overly conservative assumptions when conducting his valuation. Nickel used two approaches—the sales comparison approach and the income capitalization approach. For the sales comparison approach, he selected five comparable daycare centers sold between 2008 and 2011.[311] After making adjustments up and down based on various factors, Nickel calculated an adjusted per square foot (psf) sale price for each of the five centers.[312] He then honed in on two transactions—a 2009 daycare sale in Frazer, Pennsylvania at $104.92 psf and a 2011 daycare sale in

---

[311] JX 137 at 37.

[312] *Id.* at 41.

Middletown, Delaware at $145.31 psf—as an upper and lower bound for HCW's price psf.[313] He ultimately determined that HCW's indicated property value was just above the lower bound at $105 psf. After other adjustments, Nickel derived HCW's real estate value under the sales comparison approach at $500,000.

While light on specifics, and even lighter on expert analysis (Pelillo did not undertake any review of Ford or Nickel's work), it appears the Banoubs' primary objection to Nickel's valuation is that he chose a value just pennies above the lower bound he set without "showing his work." I am not persuaded.

I note at the outset that I found Nickel's trial testimony, where he explained his real estate valuation, both reasonable and credible. Nickel characterized his comparables approach as "an interpretation of the data which is an interpretation of market participant actions."[314] While these evaluations are not performed with mathematical precision, this alone does not render them unreliable.[315] Nickel did what real estate appraisers do—he employed his expertise to select the most appropriate comparables, explained his rationale and then completed his valuation.

---

[313] *Id.* at 39–42.

[314] Tr. 33 (Nickel).

[315] Indeed, our Supreme Court has cautioned against "the visual appeal of a mathematical formulation to create an impression of precision." *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 388 (Del. 2017).

The Banoubs ask the Court to consider the upper-bound or average of the range, but provide no justification for doing so. Thus, any effort to "split the baby" by choosing the mathematical midpoint of the upper- and lower-bound would be completely arbitrary. A mathematical average is especially inapt in circumstances with so few comparable sales to begin with, because fewer comparables means a higher expected standard deviation of value among comparables. I see no compelling reason to substitute a mathematical average or my own guess for Nickel's expertise, and the Banoubs have offered none.

Next, the Banoubs take aim at Nickel's income capitalization approach. For this approach, Nickel found leases for comparable daycares, adjusted their price up or down based on various factors, determined a likely range based on two of the samples and, from that, derived an indicated rental psf figure to apply to HCW's 4882 square feet.[316] In Nickel's report, he estimated the annual rental value of HCW's facility to be $61,025 and the annual rental value of the single-family residence on HCW's property to be $14,280, for a collective potential annual gross rental value of $75,305.[317] After adjusting for expenses, he derived a net operating income of $60,407. In two final steps, Nickel applied a capitalization rate of 9.50%

---

[316] JX 137 at 43–48; Tr. 38–43 (Nickel).

[317] JX 137 at 54.

to the net operating income and subtracted estimated lease-up costs and entrepreneurial incentive costs (totaling $73,938) to compute a final capitalized value of $560,000.[318]

The Banoubs contend that a better indication of the fair value of HCW's real estate existed at the time of Nickel's report: an actual, signed lease for HCW's property.[319] In fact, unbeknownst to Nickel, Tanyous was negotiating a lease with a tenant while Nickel prepared his real estate valuation.[320] Nickel offered his opinion on May 17, 2012.[321] Tanyous closed the lease only two weeks later, on June 1, 2012 (the "HCW lease").[322] The Merger Date, of course, was just over two months *after* the HCW lease was signed.

The HCW lease term was for one year.[323] The rent was waived for the lessee's first two months—June and July—and the rents for August and September were at a reduced rate of $5,000 per month.[324] The rent for the final eight months was

---

[318] *Id.*

[319] JX 146.

[320] JX 146 (Lease between HCW and Happy Place Day Care, dated June 1, 2012); Tr. 43–45 (Nickel).

[321] JX 137.

[322] JX 146.

[323] *Id.*

[324] JX 147 at 15.

$6,000 per month.[325] Thus, the annual rent was $58,000, while the effective annual rental rate (i.e., the scaled up $6,000 rental rate over one year) was $72,000.[326] The broker's commission was $3,480.[327]

The Banoubs argue that I should substitute the relevant values substantiated by the HCW lease into Nickel's model. More specifically, they say I should substitute Nickel's estimated facility rental value of $61,025 for the lease's effective rental rate of $72,000, and reduce the entrepreneurial and lease-up costs from $73,938 to $17,480—the sum of the broker's commission and the reduced rent provided in the first two months of the lease.

I agree, in principle, that the relevant values substantiated by the HCW lease are more reliable inputs and should be substituted for Nickel's hypothetical values. Delaware law is clear that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered" in an appraisal proceeding.[328] Nickel's valuation estimates the actions of market participants, while the HCW lease substantiates them. The HCW lease, therefore, is a better indicator of the value of

---

[325] *Id.*

[326] *Id.* at 1.

[327] *Id.*

[328] *Weinberger*, 457 A.2d at 713; *see also Technicolor*, 684 A.2d at 300.

HCW's real estate, and its relevant values will be substituted into the model where appropriate.

Before revising the Nickel model, I must confront three related issues. First, it remains unclear whether the HCW lease includes the residence located on the HCW property. The answer to that question has obvious implications. On the one hand, if the $72,000 HCW lease includes the residential property, then Nickel's estimation of the potential gross rental rate ($75,305) is too high. On the other hand, if the HCW lease does not include the residential property, then Nickel's estimation of the daycare property ($61,025) is too low.

It is appropriate here to remember the burden of proof. When conducting an appraisal under entire fairness review, I must "endeavor[] to resolve doubts, at the margins, in favor of the [minority shareholders]."[329] With this in mind, I proceed under the assumption that the lease does not include the value of the residence on the property.[330]

Second, the HCW lease was to expire in one year, whereas Nickel's model was built assuming the typical lease in the daycare industry runs for five years.[331]

---

[329] *Del. Open MRI*, 898 A.2d at 313.

[330] I note that Tanyous could have clarified whether the lease he negotiated included the residential property; he failed to do so.

[331] JX 137; Tr. at 45 (Nickel).

This raises the question of whether the effective rental rate of $72,000 is affected by the HCW lease's one-year term. Nickel answered the question at trial; one would not expect a tenant to pay more or less for a one-year lease.[332]

Third, I must decide how to account for the $17,480 broker's fee and reduced rent. The Banoubs assert these fees should be substituted for the entrepreneurial incentives and lease-up costs, while Tanyous contends the fees should be subtracted from the $72,000 rental rate. After carefully considering the evidence, I am satisfied that the broker's fee and reduced rent fall in the category of lease-up costs, i.e., those costs "associated with locating a day care operator to either lease or purchase the property."[333] I also eliminate all costs associated with "entrepreneurial incentives." Nickel described entrepreneurial incentives as "a measure of reward associated with locating a daycare operator to either lease or purchase the property."[334] The existence of the HCW lease implies that a daycare operator had already been located at the time of the transaction, rendering this deduction inapt.

---

[332] *See* Tr. at 45 (Nickel) ("Q. Would one expect a tenant to pay less the shorter the term for a one-year lease? A. No. I wouldn't expect it. No.").

[333] JX 137 at 54.

[334] *Id.*

After carefully considering the evidence, I derive an income capitalization value of $763,091.[335] After averaging that value with the sales comparables estimate of $500,000, as Nickel did, I derive a total real estate value of $631,450.50. After making the uncontested adjustments for HCW's liabilities as of the Merger Date, I conclude HCW's NAV equals $221,129.50.[336]

### c. The Earnings-Based Indicated Equity Value of HCW Is $50,794

Neither party disagrees with the utility of Ford's Capitalization of Earnings ("CE") Method.[337] The Banoubs, however, take issue (without expert support) with two critical inputs in Ford's model: the cost of debt and the cost of equity. I find Ford's computation on both fronts reasonable and credible.

To calculate the cost of debt, Ford used an 11.25% rate, which was the sum of the mortgage rate (6.25%) and the penalty rate imposed by HCW's mortgage

---

[335] More specifically, I substitute into Nickel's Direct Capitalization model $72,000 in base annual rental rate for the daycare's base rent. I add his undisputed estimate for the owner-occupied single-family residence ($14,280) to derive a potential gross rent of $86,280. After subtracting an estimated 5% for vacancy and collection loss, and his undisputed expenses incurred in the ordinary course of running a facility, I reach a net operating income figure of $70,833. After capitalizing that figure by Nickel's 9.5% capitalization rate, and adjusting for the substituted $17,480 in lease up costs (and $0 for the entrepreneurial incentive), I derive a stabilized value indication of $763,090.53 for the property, which I then round to $763,091.

[336] *See* JX 14, Ex. D.

[337] *See* Banoubs' Post-Trial Opening Br. at 58 (stating "there is no opposition to utilization of [Ford's Capitalization of Earnings] approach").

lender (5%).[338] The Banoubs counter that the penalty rate should be subtracted from the mortgage rate because Tanyous was responsible for the mortgage landing in default.

The Banoubs' argument is unconvincing. HCW's financial records show that it was highly leveraged, operating at an average net loss of $57,500 from 2009 to 2011.[339] A mortgage penalty is understandable for a company with a large mortgage obligation and limited operating income. Thus, the mortgage penalty rate is properly accounted for in the calculation of HCW's cost of debt as a feature of HCW's operative reality.

For the cost of equity, Ford used a generally accepted build up method, relying on the Ibbotson SBBI 2011 Valuation Yearbook, which documents publicly available data for stocks, bonds, bills and inflation from 1926-2011.[340] When employing the build-up method, the appraiser must compute the company's "Size Premium."[341] The Banoubs object to Ford's reliance on this dataset for the calculation of a size premium because the lowest decile of companies available in

---

[338] JX 147, Ex. C; JX 128 (Default Letter from Citizens Bank, dated Mar. 9, 2012).

[339] JX 147, Ex. B.

[340] JX 147 at 12.

[341] *Id.*

Ibbotson had a market capitalization between $1.028 million and $86.757 million.[342] HCW is nowhere near that size, they observe, making any comparison to the Ibbotson companies inappropriate.

I am satisfied, however, that Ford's approach to deriving the cost of equity is reliable under the circumstances. As then-Vice Chancellor Strine noted while conducting a similar appraisal under entire fairness review, the application of income-based valuation models such as the CE in valuing a small, privately owned entity "has its challenges, principally in the area of calculating a proper cost of capital. In this situation, the absence of both market information about the subject company and good public comparables force the court to rely even more than is customary on the testimonial experts. That reality is inescapable."[343] The Banoubs offer no alternative data set and point, instead, to their own expert report, which I have already held to be unreliable and not credible for too many reasons to count. The fact is that finding comparables for HCW is difficult. Ibbotson is the best data on record, and I am satisfied it is appropriate to rely on that data, in this circumstance, to derive a cost of equity.

---

[342] *Id.* at 13.

[343] *Del. Open MRI*, 898 A.2d at 331.

After carefully considering Ford's CE valuation, and the Banoubs' criticisms of that analysis, I am satisfied that Ford's approach is both credible and reliable. Thus, I conclude the value of HCW, per the Capitalized Earnings method, is $50,794.

### d. HCW's Fair Value Without Litigation Assets

In his final step, Ford chose to weight equally the different values derived from the NAV and CE methods in calculating his final fair value of HCW on the Merger Date.[344] The Banoubs challenge this weighting on two grounds. First, they argue it makes little sense to trust Ford's CE method when he describes the NAV as a "floor" in his report.[345] In other words, if the NAV valuation is, in Ford's own words, a "'floor' or the lower range of a fair value determination of the Company," and the CE valuation is less than the NAV valuation, then the CE valuation should be disregarded entirely. Second, they argue that the NAV value and the CE value should be added, just as Pelillo added values derived from the methods he employed.

Once again, I am not persuaded. The CE method gives primary consideration to cash flow, and so is typically used to value operating entities; the NAV approach gives primary consideration to the value of underlying assets, and so is most apt for

---

[344] JX 147 at 9.

[345] *Id.* at 14.

investment or holding companies.[346]  An operating daycare business is a cash-flow

business that would typically merit an income-based valuation approach.

An operating company presumably incurs higher operating expenses than a non-

operating company.  In HCW's case, these expenses led to an average net income

loss of $76,941.20 from 2007 through the Merger Date.[347]  If HCW were to continue

as a daycare post-merger, there is no basis in the evidence to conclude that its

performance or value would have improved.

Upon the execution of the Merger, however, HCW was no longer operating

as a daycare center.  Regulators were threatening to revoke HCW's license to

operate, and Tanyous recently discovered that he could lease the building without a

daycare license.[348]  He opted to lease out the real estate for one year and then decide

whether to restart operations.[349]  A pure leasing business model is more appropriately

valued under an NAV approach.  If the one-year HCW lease was not renewed,

however, there is no evidence another lessor was waiting in the wings, nor is there a

---

[346] JX 147.

[347] JX 147, Ex. B.

[348] JX 133.

[349] Tr. 578 (Tanyous).

basis to predict, as of the Merger, whether HCW would have resumed its daycare operations.[350]

Because the Company's future business model was uncertain as of the Merger Date, it makes sense to average the CE value and the NAV value, as Ford elected to do to reach his final fair value appraisal.[351] Here again, I find that Ford's explanation for his allocation approach was credible, and I have no basis in the evidence to allocate differently. Having determined HCW's asset-based value is $221,129.50, its income-based value is $50,794, and the two models should be weighted equally, I conclude that the fair value of HCW's equity interest as of the Merger Date was $135,961.75.

One final issue remains before turning to the value of the derivative claims. In Ford's Report, he reclassifies certain stockholder loans to equity in determining each party's indicated equity value on the Merger Date. This diluted the Banoubs' share of HCW from 45% to less than 10%. The Banoubs, understandably, object.

A company generally metabolizes investors' capital in one of two ways: equity or debt. These two types of infusions are differentiated in demonstrable ways, such as a note indicating the interest at which a debt is meant to be paid. According

---

[350] Tr. 551 (Tanyous) (testifying that he had the option to reopen the daycare after the State revoked its license if he brought it up to code).

[351] Tr. 111 (Ford); JX 147.

to Ford, stockholder loans were originally characterized as such in HCW's 2011 tax return.[352] If Tanyous argues these loans should be reclassified, then the burden is on him to explain why. Ford offers nothing to support the reclassification beyond his summary statement (in his report, not explained at trial) that "it was my determination that these loans acted more like capital infusions into the Company." That says nothing of the bases for the reclassification. Without more, I reject Ford's reclassification. HCW has 100 shares, and the Banoubs own 45 of those shares.

### e. HCW's Fair Value With Litigation Assets

Having determined the fair value of HCW without its litigation assets, I turn next to the questions of whether and how to incorporate HCW's pre-merger litigation assets in the appraisal. The answer to the first question is clearly yes, for reasons already stated; the pre-merger litigation assets, in this case HCW's claims against the Banoubs and Tanyous, should and will be incorporated in the appraisal.[353]

---

[352] JX 147 at 16.

[353] *See Cavalier Oil Corp.*, 564 A.2d at 1142; *Nagy*, 770 A.2d at 55–56; *Porter*, 1989 WL 120358, at *5. I acknowledge that, at first glance, there may be some incongruity in this outcome. Giving value to company claims of wrongdoing against owners in an appraisal, and then "round tripping" that value back to the owner via an appraisal award, in some instances, may offend notions of equity. But here, both owners have been found to have misappropriated funds prior to the Merger. The approach I have taken values each owner's share in the Company as if they have had returned those funds to the Company in advance of the Merger and thereby enhanced the firm's value for the benefit of all concerned. My sense of equity is not offended by this outcome, under the circumstances, and I am further convinced that the approach taken provides the most efficient means to

The answer to the second question—how to incorporate the litigation assets—requires further discussion.    When valuing contingent (unfiled) corporate (or derivative) claims for appraisal, the court often will consider litigation risk and expenses associated with the claims, and may discount the value of the claims to account for that risk.[354]  There is no need to apply such discounts here.  The parties have litigated HCW's pre-Merger claims in this consolidated case, and I have decided them.  The value of those claims, now determined, is the equivalent of cash in the corporate coffers.  I treat the litigation assets in that manner for purposes of appraisal.

As explained, HCW's combined litigation assets (HCW's proven claims against the Banoubs and Tanyous) have a fair value of $82,298.40, and HCW's non-litigation equity has a fair value of $135,961.75.  Thus, I appraise the fair value of HCW as of the Merger at $218,260.15.

---

resolve all claims in recognition of the rather unique and convoluted posture in which they have been presented.

[354] *See, e.g.*, *Cavalier Oil Corp.*, 564 A.2d at 1141–44 (observing it is appropriate to value accrued, but unlitigated derivative claims, with consideration of litigation risks and costs as discounts to value); *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *8 (Del. Ch. Mar. 31, 2009) (same); *Oliver*, 2006 WL 1064169, at *20 (same); *Bomarko, Inc. v. Integra Bank*, 794 A.2d 1161, 1189 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000) (same); *Onti, Inc. v. Integra Bank*, 751 A.2d 904, 931–32 (Del. Ch. 1999) (same).

### f. The Banoubs' Adjusted Appraisal Award

To derive the Banoubs' proper appraisal award, I must account for both their share in HCW's fair value at the time of the Merger (including its litigation assets), as well as their liability to HCW for their breaches of fiduciary duty. In other words, I subtract the Banoubs' liabilities to the Company from their *pro rata* interest in HCW's fair value, including its litigation assets. This method effectively adjusts the Banoubs' equity-based appraisal award in proportion to their personal liabilities to the Company.

The math is simple. The Banoubs' 45% share of HCW's fair value of $218,260.15 at the Merger is $98,217.07. Their liability to HCW for breaches of fiduciary duty as of the Merger is $62,199.11. Their adjusted appraisal award ($98,217.07 – $62,199.11) is $36,017.96.

### III. CONCLUSION

The Court has found that the HCW fiduciaries, the Banoubs and Tanyous, all breached their fiduciary duties to HCW. The Court has valued HCW's claims in that regard and has incorporated that value into an appraisal of HCW. The appraisal petitioner is entitled to his share of HCW's fair value at the Merger, adjusted for his liability to HCW. That equates to $36,017.96 in total, or $800.40 per share. The legal rate of interest, compounded quarterly, shall accrue on this amount from the

date of the Merger until the date of payment.  The parties shall confer and submit a final judgment and order to the Court within the next fourteen (14) days.